[Nos. B059352, B062588. Second Dist., Div. Five. Feb. 26, 1993.]

SHEILA DONAHUE MILLER, Plaintiff and Appellant, v.
CITY OF HERMOSA BEACH, Defendant and Respondent;
HARE, BREWER, KELLEY, INC., et al., Real Parties in Interest and
Respondents.

---

**COUNSEL**

Sheila Donahue Miller, in pro. per., and Joseph M. Freschi for Plaintiff and Appellant.

Oliver, Stoever, Barr & Vose and Charles S. Vose for Defendant and Respondent.

Latham & Watkins, J. Wesley Skow, Elizabeth A. Meinicke and Robert D. Crockett for Real Parties in Interest and Respondents.

## OPINION

**GRIGNON, J.**—By these consolidated appeals, appellant Sheila Donahue Miller seeks to reverse a judgment of dismissal of her petition for writ of mandate. She also seeks review of the denial of her request for a preliminary injunction to enjoin construction of a beachfront hotel following issuance of a building permit by respondent City of Hermosa Beach (the City). The hotel project was undertaken by respondent Hermosa Beach Investment Company (HBIC).

Miller contends that the City violated the California Environmental Quality Act (CEQA)[1] by issuing a building permit for the hotel without requiring preparation of an environmental impact report (EIR). Respondents contend that Miller's petition for writ of mandate was properly dismissed since Miller failed to satisfy the procedural requirements of CEQA. We reverse the judgment of dismissal and the order denying the request for a preliminary injunction.

### FACTS AND PROCEDURAL BACKGROUND

During 1984, the City council enacted an ordinance authorizing the City to enter into a development agreement and ground lease with HBIC,[2] for the construction of a hotel, conference center and parking garage to be located on property owned by the City as well as a parcel owned by HBIC. The hotel site was on The Strand in Hermosa Beach, which runs parallel to the City's public beach. A referendum election was held on December 11, 1984, and City voters overturned the ordinance authorizing the hotel project by a margin of 19 votes.[3]

HBIC redesigned the hotel project to meet voter concerns apparently by "downsizing" the project to 70 percent of its original scale. An EIR was

---

[1]Public Resources Code section 21000 et seq.

[2]HBIC is a partnership of Greenwood-Langlois and Hare, Brewer, Kelley, Inc. For ease of reference, we will refer to Hare, Brewer, Kelley, Inc., and Greenwood-Langlois as HBIC.

[3]The hotel project had also been the subject of an earlier referendum election to grant a height variance. That referendum election, held in 1983, failed by 200 votes. Thereafter, additional land was acquired so that the project could be redesigned to meet existing height restrictions.

prepared, certified, and filed with the City sometime in 1985.[4] An initiative to approve the revised hotel project was placed by the City on a special election ballot set for June 11, 1985. Litigation ensued, with opponents of the hotel project contending that the City had violated the Elections Code by conducting two initiatives concerning the same subject matter within 12 months. A peremptory writ of mandate issued in May 1985, commanding the City not to hold the special election. This judgment was later reversed on appeal.[5] (*Referendum Committee* v. *City of Hermosa Beach* (1986) 184 Cal.App.3d 152 [229 Cal.Rptr. 51].) The special initiative election was actually held in 1985. Further litigation ensued challenging the propriety of certain ballots. (*Escalante* v. *City of Hermosa Beach* (1987) 195 Cal.App.3d 1009 [241 Cal.Rptr. 199].) The initiative election resulted in a tie vote. Therefore, the hotel project was not approved by the voters.

In October 1984, the Coastal Commission issued a coastal development permit for the hotel. In February 1987, the Coastal Commission approved a development permit extension. On June 25, 1990, the Coastal Commission issued a "Notice of Intent to Issue Permit" pending satisfaction of certain conditions of development. That notice of intent was to expire on March 15, 1992. The Coastal Commission staff report noted, "LOCAL APPROVALS RECEIVED: Approval in concept. CEQA—categorically exempt."

In May 1989, the City rezoned the hotel project site to C-2/limited commercial, with a 35-foot height limit. On July 25, 1989, HBIC submitted an application for a hotel project to include 172 rooms in 2 four-level buildings, all to be located entirely on private property. Total square footage for both structures was 91,863 square feet. The hotel had been redesigned to fit on private land by providing three levels of subterranean parking instead of one level.

On August 2, 1989, the City manager wrote to HBIC regarding the hotel project and noted, "Since you indicated your goal was to avoid discretionary approvals requiring environmental assessment, I wanted to be as fair as possible by communicating immediately that staff has many concerns about this aspect of the proposal." The letter went on to cite the degree of excavation, which "brings in engineering considerations that are not clear cut in the Building Code, and require an evaluation that may well constitute discretionary review. The impact on the water table, the effects of the method of disposal of ground water, and the impact on surrounding properties all are possible impacts well beyond the normal range experienced in our

---

[4] This EIR is not part of the record on appeal.

[5] Division Four of this appellate district held that the Elections Code did not proscribe a special referendum election followed by a special initiative election on the same subject within a 12-month period.

City and anticipated by our Zoning and Building Codes. [¶] Further, the project obviously may require use of public areas adjacent to it . . . . [¶] For these reasons, staff is of the consensus that an environmental assessment on your proposal is appropriate and necessary. . . ." The City manager indicated that an addendum to the EIR was required.

On August 17, 1989, the City planning director wrote to HBIC and remarked as follows with respect to the necessity for a new EIR: "However, since the new hotel proposal has some definite differences in its developmental characteristics, i.e., 3 levels of underground parking, and 4 levels of lot line to lot line development above-grade, it will be necessary to provide an addendum with additional mitigation measures. [¶] Further, since the most related issue to the current proposal and new development, since certification of the E.I.R., as noted above is traffic. The current traffic volume should be re-evaluated in light of your proposal. The newly drafted circulation element for the city should provide the necessary data for this evaluation."

On November 15, 1989, HBIC obtained an "Approval in Concept" from the City, together with "Conditions of Approval." The Approval in Concept provided that the hotel project plans had been reviewed and that they complied with the City's general plan, zoning ordinance, subdivision ordinance, and any applicable specific or precise plans, or that a variance or exception had been approved and was final.

The Conditions of Approval provided that those conditions "are imposed on the development . . . to alleviate impacts to surrounding properties." They included conditions relating to traffic and circulation, pavement evaluation, excavation and dewatering, sanitary sewer, storm drainage, insurance policy, associated cost, noise, parking, aesthetics, public safety, utilities and other general aspects. Many of the conditions addressed relatively minor concerns; others called for studies to investigate certain of the impacts of the hotel project.

Because the central legal issue on appeal is whether the City's issuance of a building permit was "ministerial" or "discretionary" (see Discussion, *post*), it is necessary to recite in full certain of the more substantial Conditions of Approval:

"TRAFFIC AND CIRCULATION

"1. Developer to prepare with City to review and approve prior to building permit issuance a focused traffic engineering impact analysis of the

vehicular and pedestrian circulation affected by the proposed hotel on the City street system and at the hotel access points . . . . The analysis shall be prepared by a licensed traffic engineer.

"PAVEMENT EVALUATION

"1. A pavement evaluation is to be performed on the adjacent streets and the proposed truck routes prior to the issuance of a building permit . . . .

"2. A projection of the deterioration of the pavement is to be performed and the developer shall be required to restore the pavement to the condition it was prior to construction on all street where the construction transportation occurs.

"EXCAVATION AND DEWATERING

"1. During the excavation stage no ground water shall be allowed to enter the storm drainage system.

"2. No water shall be allowed to surface flow across the public beach.

"3. The dewatering shall not interfere with any of the recreation uses on the public beach.

"4. A soil settlement analysis shall be performed by a licensed soils engineer.

"5. Analysis shall be reviewed by an independent Soils Engineer hired by [the City].

"6. [] The soils engineer shall determine and submit a plan showing the potential zone of influence for settlement. Settlement shall be limited to 0.01 feet at the property boundary.

"7. The adjacent public and private property area shall be surveyed a minimum of 250' from the zone of influence . . . . This shall be done before the construction begins and shall be monitored during and after construction to evaluate if there was any settlement, movement or damage to the public and private facilities.

"SANITARY SEWER

"Developer shall provide an engineering analysis and a condition inventory survey of the existing sanitary sewer system downstream from the hotel

site. Included within this survey shall be an evaluation to determine what will happen to peak capacity flows in the sewer line and what downstream impacts are anticipated.

"STORM DRAINAGE

"The storm drain on 13th and Beach Drive . . . shall be extended to the project site. . . . Only storm water shall be allowed to enter said pipe.

"AESTHETICS

"1. Renderings depicting the architecture, and identifying all features, colors and materials to be used for all sides of each structure shall be submitted for review and approval by the Planning Director. . . .

"GENERAL

"1. The development shall be in substantial compliance with approved plans and conditions of approval and any deviation shall be submitted to the City for review and approval."

On April 24, 1990, the City, through its City council, issued a declaration that the hotel project was statutorily exempt from CEQA. The City maintained that its issuance of a building permit for the hotel was a ministerial, not discretionary, act, and no EIR was required under CEQA. On that date, the City enacted an ordinance which, apparently, would have interfered with the hotel project.[6] However, the ordinance included a "grandfather clause" allowing those projects submitted prior to March 27, 1990, to proceed so long as a building permit was received within six months, i.e., on or before November 26, 1990.

On October 1, 1990, the City planning director wrote in a planning department memorandum: "Discretionary review and approval by the City Council was agreed to be necessary by all for the following reasons: [¶] 1. Dewatering during construction is proposed to consist of piping that will cross over, underground, the City's public beach area and travel out into the ocean to an unknown extent. [¶] 2. The tie-back method of shoring, if used, will result in the use of City land. [¶] 3. The closure of the public alley (Beach Drive) during construction is proposed. [¶] Discretionary review will result in the need to file a precise development plan application and have a public hearing before the Planning Commission as well as approval by the City Council for the above noted matters."

---

[6]The record does not reflect the subject matter of the ordinance.

On October 30, 1990, HBIC wrote to the City Council in an effort to address the concerns of opponents of the hotel project. Its letter read in relevant part: "It has been suggested that our project should have been treated as 'discretionary.' This is clearly ridiculous. We are constructing a project that complies strictly with Hermosa Beach zoning and building codes. We have not sought approval from the staff or council for deviation in any respect from the codes. In short, this project is no different than a single family house built to code . . . . [¶] Every project, whether commercial or residential, involves the exercise of judgment in electing between alternatives for compliance with applicable requirements . . . . [¶] Because we agreed, in a spirit of cooperation, to provide to City staff various technical information and to seek staff review of certain alternatives does not make the project discretionary . . . . [T]his in no way means that the project is discretionary."

On November 26, 1990, the City issued building and demolition permits for the hotel project.

On March 29, 1991, Miller filed a complaint for declaratory and injunctive relief and petition for writ of mandate. Miller brought this action as a private attorney general to prevent significant adverse impact of the hotel on the environment, including but not limited to, subsidence, damage from dewatering, and toxic contamination. Miller contended that the issuance of a building permit was in violation of CEQA in that no EIR had been prepared to ensure mitigation of these significant environmental impacts.

Miller's petition alleged in some detail the manner in which the City had exercised its discretion in issuing the building permit, including the attachment of 23 substantial conditions to the building permit. It appears from the record that satisfaction by HBIC of the conditions actually attached to the City's 1989 Approval in Concept of the project was a precondition to issuance of the building permit. Miller contended that when the building permit was issued in November 1990, the Conditions of Approval had been redrafted. Miller contended that the project was not "approved" within the meaning of CEQA until November 1990, because there had been changes in the ultimate conditions of building.

HBIC concedes there were some discrepancies between the two sets of conditions including: (1) the additional requirement of a monitor of public and private structures during dewatering; (2) the employment of a secondary settlement condition, i.e., that the project not settle more than .01 foot at the property boundary as opposed to the prior no settlement condition; (3) HBIC's permission to use storm drain facilities, which would be replaced by

HBIC in the event the monitor detected settlement as opposed to the prior nonuse condition; (4) the additional requirement that any above-ground visible damage would be repaired to the satisfaction of the City; (5) the additional provision for parking displaced during construction; (6) the additional requirement of signage and flag persons during construction; (7) the erection of an additional barrier wall; (8) the additional provisions for signing and striping of roads, planter breaks, and pedestrian access; (9) the additional requirement of a surety bond; and (10) the additional requirement of a hydrologist's report on the affect of rain flows on the 14th Street sewer.

Miller argued the elimination of certain of the original conditions indicated the discretionary nature of the issuance of the building permit. For example, she pointed out that the Approval in Concept forbade HBIC from using the storm drains during dewatering, as the force of the water could erupt the system. The City had indicated, in a letter to HBIC from the City attorney, that any alternative proposal would require an addendum to the EIR. By eliminating this condition to the building permit, the City agreed to allow use of the storm drain system. Miller further argued that the Uniform Building Code permitted no settlement or subsidence, whereas the City had agreed to permit a small degree of subsidence.

The petition sought a writ of mandate under both CEQA and more general authority to revoke and set aside the building permit already issued. In addition, Miller sought temporary and preliminary injunctive relief to halt construction of the hotel, and a judicial declaration that no building permit could issue until an EIR had been prepared.

*Miller's Request for Preliminary Injunction*

On April 1, 1991, Miller sought a temporary restraining order to halt construction of the hotel. The application was denied, but an order to show cause re preliminary injunction issued. Written opposition was filed contending that Miller's petition was subject to certain procedural defects, the petition was untimely under CEQA, Miller had failed to exhaust her administrative remedies, the issuance of the building permit was exempt as ministerial, and the "functional equivalent" of an EIR had been prepared by the California Coastal Commission. A hearing was held on April 16, 1991. After lengthy and detailed argument, the request for preliminary injunction was denied.

On May 22, 1991, a hearing was held on Miller's motion for reconsideration of the denial of her request for a preliminary injunction. Miller submitted additional declarations purporting to demonstrate that the California Coastal Commission had not, in fact, performed the "functional equivalent" of an EIR on the hotel. The motion was opposed by respondents and,

following hearing on the matter, the motion was denied. HBIC's request for sanctions was set for hearing on June 24, 1991, in conjunction with the hearing on respondents' demurrers to the petition. At that hearing, the demurrers were overruled and the request for sanctions was denied.

*Motion for Judgment on the Pleadings by HBIC and the City*

On July 2, 1991, HBIC filed a motion for judgment on the pleadings, arguing that judgment should be granted in favor of HBIC on the ground Miller had not noticed a hearing on her petition for writ of mandate within 90 days of filing, as required by CEQA. The City joined in the motion on July 10, 1991. On July 23, 1991, the motion was granted as to HBIC, but not the City, since the City's notice of joinder was untimely. HBIC then moved for reconsideration of this order, arguing that judgment should also be granted in favor of the City. Miller opposed. The motion for reconsideration was apparently denied.[7] On August 28, 1991, the City moved for judgment on the pleadings on the same ground previously urged by HBIC. On September 16, 1992, that motion was granted following a hearing. Miller moved to set aside the orders of judgment on the pleadings of July 23, 1992, and September 16, 1992, and requested relief pursuant to section 473 of the Code of Civil Procedure.

Notice of appeal was filed on June 21, 1991, from the order denying the preliminary injunction of April 16, 1991, and the order denying reconsideration of May 22, 1991. The judgment of dismissal on the pleadings in favor of both the City and HBIC was filed on October 4, 1991, and a notice of appeal therefrom was filed on October 24, 1991.[8] We issued an order consolidating the two appeals.

## DISCUSSION

CEQA requires that all local governmental agencies prepare or have prepared an EIR on "any project they intend to carry out or approve which may have a significant effect on the environment." (Pub. Resources Code, §§ 21100 and 21151.) An EIR is a public document used by a governmental agency to analyze the significant environmental effects of a proposed project, to identify alternatives, and to disclose possible ways to reduce or avoid the possible environmental damage. (Pub. Resources Code, § 21100; Cal. Code Regs., tit. 14, § 15002.) Preparation of an EIR has been described as "key to environmental protection under CEQA." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].)

[7]The minute order is not part of the record on appeal.
[8]We have granted HBIC's and the City's request for judicial notice.

CEQA and the regulations issued by the State Resources Agency to implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq., referred to herein as Guidelines) envision a three-staged process for determining whether an EIR is required for a project. First, if it can be determined with certainty that a project will not have a significant effect on the environment or is statutorily or categorically exempt from CEQA, then no further evaluation is required. Second, if the project may have a significant environmental effect, the agency must undertake an initial study. Third, if the initial study reveals that no significant environmental effect will be caused, then the agency may issue a negative declaration. (Cal. Code Regs., tit. 14, § 15083.) Otherwise, an EIR is required to be prepared. (Pub. Resources Code, §§ 21061 and 21100.) (See *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 74.) Public notice must be given of the preparation of an EIR or issuance of a negative declaration. (Pub. Resources Code, § 21092.)

When an EIR has been prepared for a project, no subsequent or supplemental EIR is required to be prepared unless: (a) substantial changes are proposed in the project which will require major revisions of the EIR; (b) substantial changes occur with respect to the circumstances under which the project will be undertaken which would require major revisions in the EIR; or (c) new information, not known at the time of certification of the earlier EIR, becomes available. (Pub. Resources Code, § 21166.) The Guidelines define "new information" as showing that: "1. The project will have one or more significant effects not discussed previously in the EIR; [¶] 2. Significant effects previously examined will be substantially more severe than shown in the EIR; [¶] 3. Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effect of the project; or [¶] 4. Mitigation measures or alternatives which were not previously considered in the EIR would substantially lessen one or more significant effects on the environment." (Cal. Code Regs., tit. 14, § 15162, subd. (b).)

A subsequent EIR is to be prepared by the agency which grants the next discretionary approval for the project. (Cal. Code Regs., tit. 14, § 15162, subd. (b).) Alternatively, the Guidelines provide that a supplemental, rather than subsequent, EIR may be prepared if the above quoted conditions apply but "[o]nly minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation." (*Id.* at § 15163, subd. (2).) However, the same notice and public review requirements attach to a supplemental EIR as to an original EIR. (*Id.* at § 15162, subd. (c).) Finally, if a prior EIR has been certified, an addendum may be prepared if conditions requiring a subsequent EIR do not exist, only minor technical changes or additions are necessary to make the original EIR

adequate, and the changes to the EIR made by the addendum do not raise important new issues about the significant effects on the environment raised in the original EIR. (*Id.* at § 15164.)

CEQA requires EIR to be prepared only in connection with "discretionary projects" proposed to be carried out or approved by public agencies. (Pub. Resources Code, § 21080, subd. (a).) These include the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits, and the approval of tentative subdivision maps. (*Ibid.*) However, CEQA does not apply to "[m]inisterial projects proposed to be carried out or approved by public agencies." (*Id.* at § 21080, subd. (b)(1).)

In the case at bar, Miller contends that no EIR was prepared for the hotel project. The City contends that Miller has failed to comply with the applicable statute of limitations for her mandate proceeding, and relief from default was properly denied. In addition, the City maintains that the issuance of a building permit for the hotel project is not a "discretionary project" requiring preparation of an EIR, but rather, a ministerial one. Each of these arguments will be addressed in turn.

*Judgment on the Pleadings*

In litigation brought to challenge a public agency's noncompliance with CEQA, proceedings shall be in accordance with section 1094.5 of the Code of Civil Procedure if "by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . ." (Pub. Resources Code, § 21168.) In an action under Public Resources Code section 21168, the court must determine "whether the act or decision is supported by substantial evidence in the light of the whole record." (*Ibid.*) We conclude from the record before us that the City did not conduct, nor was it required to conduct, an evidentiary hearing before issuing the subject building permit. Thus, Public Resources Code section 21168 is inapplicable.[9]

In an action or proceeding *other than* one pursuant to Public Resources Code section 21168, to "attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance" with CEQA (Pub. Resources Code, § 21168.5), the inquiry shall extend only to whether "there was a prejudicial abuse of discretion." (*Ibid.*) "Abuse of discretion is established if the agency has not proceeded in a

---

[9]The parties, as well as the trial court, seemed to assume that this section applies. Their misapprehension is immaterial to our analysis.

manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*)

All actions or proceedings alleging that a public agency has failed to determine whether a project may have a significant effect on the environment must be commenced within 180 days of the agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days after commencement of the project. (Pub. Resources Code, § 21167, subd. (a).) If the action contends that the public agency has improperly determined the project is not subject to CEQA's EIR requirement, then the action must be brought within 35 days of the filing of an applicable notice (pursuant to Pub. Resources Code, § 21108) or within 180 days of the agency's decision to carry out or approve the project. (*Id.* at § 21167, subd. (d).)

Further, in any writ of mandate proceeding alleging noncompliance with CEQA, "the petitioner shall request a hearing within 90 days of filing the petition or otherwise be subject to dismissal on the court's own motion or on the motion of any party interested therein." (Pub. Resources Code, § 21167.4.) ■ The hearing need not be calendared within that time period, but the request for the hearing must be filed within 90 days. (*Mitchell v. Orange County* (1985) 165 Cal.App.3d 1185, 1192 [211 Cal.Rptr. 563].) This requirement on its face applies to Public Resources Code sections 21168 and 21168.5 mandate proceedings.[10]

■ Preliminarily, we must determine whether the City is correct in asserting Miller failed to comply with the 90-day statutory period for requesting a hearing on her petition for writ of mandate and, therefore, the trial court properly granted respondents' motions for judgment on the pleadings. The motions were granted solely on account of Miller's failure to request "a hearing" within 90 days of filing her petition for writ of mandate, as required by Public Resources Code section 21167.4. Miller contends that Public Resources Code section 21167.4 fails to specify what type of hearing must be requested in order to avoid dismissal under the section. Miller did, in fact, request two hearings within the 90-day period: on her application for a temporary restraining order and on her request for a preliminary injunction. In this regard, the trial court conceded, at the July 22 hearing on HBIC's motion for judgment on the pleadings, that this matter "may be a case of first

---

[10]The distinction between Public Resources Code sections 21168 and 21168.5 is that the former pertains to petitions for writ of administrative mandate (Code Civ. Proc., § 1094.5) while the latter governs traditional mandate actions (Code Civ. Proc., § 1085). (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp. 74-75, fn. 3; *Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 725-726 [12 Cal.Rptr.2d 785].)

impression."[11] Respondents contend that the type of hearing to be requested is a hearing on the merits of the petition. They maintain that this is apparent from the language of CEQA and has been addressed in two appellate court decisions, *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1987) 189 Cal.App.3d 498 [234 Cal.Rptr. 527] and *McCormick* v. *Board of Supervisors* (1988) 198 Cal.App.3d 352 [243 Cal.Rptr. 617].

We turn first to the statutory scheme. As indicated, *ante*, Public Resources Code section 21167.4 simply provides that petitioner "shall request a hearing" or "otherwise be subject to dismissal." It does not specify the type of hearing. Only one other CEQA section speaks to this issue. Public Resources Code section 21168.9 provides in relevant part:

"(a) If a court finds, as a result of a *trial, hearing, or remand from an appellate court*, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following:

"(1) A mandate that the determination, finding, or decision be voided by the public agency.

"(2) A mandate that the public agency and any real parties in interest suspend all activity, pursuant to the determination, finding, or decision, that could result in any change or alteration to the physical environment, until the public agency has taken such actions as may be necessary to bring the determination, finding, or decision into compliance with this division.

"(3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division.

"(b) Any order pursuant to subdivision (a) shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division. The trial court shall retain jurisdiction . . . until the court has [found compliance] . . . ." (Italics added.)

The above quoted language makes reference both to "trial[s]" and "hearing[s]" on a petition for writ of mandate, and envisions that, as a result of such trial or hearing resulting in a finding of noncompliance by a local agency, the court may issue a writ of mandate voiding the local agency's earlier action and enjoining further activity or mandating specific action by the local agency and any real parties in interest. This language does not

---

[11]The trial court also remarked more than once that this "is a very, very close question."

provide that provisional relief may not be sought pending such determination, nor expressly define what type of hearing must be obtained to avoid dismissal under Public Resources Code section 21167.4.[12]

Nor do the reported decisions cited, *supra*, provide a clear answer to this question. *San Franciscans for Reasonable Growth* v. *City and County of San Francisco*, *supra*, 189 Cal.App.3d at pages 503-504, provides simply that dismissal under Public Resources Code section 21167.4 is mandatory, not discretionary, if a hearing is not requested within 90 days. Petitioner in *San Franciscans* had not made any request for any type of hearing, so that case is entirely distinguishable from the instant case.[13]

In *McCormick* v. *Board of Supervisors*, *supra*, 198 Cal.App.3d at pages 357-358, the issue was whether petitioner's request for hearing, which did

---

[12]As noted *ante*, CEQA also specifies that any proceedings pursuant to Public Resources Code section 21168 must be brought in accordance with the provisions of section 1094.5 of the Code of Civil Procedure. Code of Civil Procedure section 1094.5 provides:

"(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer, the case shall be heard by the court sitting without a jury. All or part of the record of the proceedings before the inferior tribunal, corporation, board, or officer may be filed with the petition, may be filed with respondent's points and authorities, or may be ordered to be filed by the court. . . . [¶]

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(f) The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in the light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent.

"(g) . . . [T]he court in which proceedings under this section are instituted may stay the operation of the administrative order or decision pending the judgment of the court . . . . ."

Thus, Code of Civil Procedure section 1094.5 specifies that a hearing or trial resulting in a judgment on the petition, together with provisional remedies, such as a stay, may be held. CEQA's incorporation by reference of this section does not, however, clearly resolve the issue of whether a request for a hearing to obtain a stay under Code of Civil Procedure section 1094.5 is sufficient to avoid dismissal under Public Resources Code section 21167.4. In any event, as we have noted *ante*, the instant proceeding is a traditional mandate action brought pursuant to section 21168.5 of the Public Resources Code; section 1094.5 of the Code of Civil Procedure is not implicated.

[13]Nor does dicta in that opinion cast further light on the issue of the type of hearing required to be requested. "This view [that dismissal is mandatory] is consistent with the language of [Public Resources Code] section 21167.4 and with the statutory scheme. CEQA actions have short statute of limitations periods and are entitled to preference at trial and on appeal. (Pub. Resources Code, §§ 21167, 21167.1.) Obviously, the rationale of the statutory scheme is to avoid delay and achieve prompt resolution of CEQA claims. Only a petitioner has a duty under the section. He or she must, within 90 days of filing his or her claim, request a hearing. However, the hearing need not be actually held within the 90-day period." (189 Cal.App.3d at p. 504.)

not specify a date certain for a hearing, was sufficient to comply with Public Resources Code section 21167.4. The Court of Appeal held that "it would elevate form over substance to accept appellants' argument that a mere declaratory statement that a hearing is requested is sufficient to comply with the statute." (198 Cal.App.3d at p. 358.) The court noted that the purpose of the statute "is to ensure that the mandate proceeding is conducted expeditiously." (*Ibid.*) "Although the hearing itself need not be held within 90 days (*Mitchell* v. *County of Orange* (1985) 165 Cal.App.3d 1185, 1192 []), [Public Resources Code] section 21167.4 appears manifestly designed to place CEQA challengers in the position of either tendering their claim to the court for resolution or losing it altogether." (*McCormick* v. *Board of Supervisors*, *supra*, 198 Cal.App.3d at p. 358.) Thus, the petitioner is required to "take affirmative steps sufficient to place the matter on the court's docket for a hearing, either by filing and serving a notice of hearing or utilizing some other method authorized by the local rules of the court in which the matter is pending." (*Ibid.*)

*San Franciscans* and *McCormick* are, therefore, not particularly helpful in resolving the matter at bar. Nevertheless, we are persuaded that the statutory scheme, which is designed to promote prompt resolution of CEQA matters, can only be served if a request for a hearing or trial on the ultimate merits of the petition for writ of mandate is made within 90 days of filing of the petition.

Only the petitioner bears the duty, under CEQA's statutory scheme, of requesting such prompt resolution from the trial court. A request for a preliminary injunction does not automatically place the matter on the trial court calendar. A petitioner could abandon the matter for a long period following denial of a request for preliminary injunction, leaving the project in limbo. Unless a petitioner also serves a request for hearing within the 90-day period, the public agency or real party in interest cannot be assured of prompt resolution of the ultimate CEQA issues. This is precisely the circumstance which Public Resources Code section 21167.4 is intended to avoid.

Thus, we hold that the hearing which must be requested in order to avoid mandatory dismissal under Public Resources Code section 21167.4 is a trial or hearing on the petition itself and not a hearing on provisional remedies or other collateral matters. Since Miller concedes that no such request was made within 90 days, the trial court did not err in dismissing the petition under that section.

*Request for Relief From Default*

We next address whether the trial court erred in denying Miller relief from default under section 473 of the Code of Civil Procedure. The

language of CEQA does not shield Public Resources Code section 21167.4 dismissals from the amelioratory provisions of section 473 of the Code of Civil Procedure. (*McCormick* v. *Board of Supervisors, supra,* 198 Cal.App.3d at p. 359.) ■■ Our standard of review from an order denying a Code of Civil Procedure section 473 request for relief from default has been summarized as follows:

" 'A motion seeking such relief lies within the sound discretion of the trial court, and the trial court's decision will not be overturned absent an abuse of discretion. [Citations.] However, the trial court's discretion is not unlimited and must be " 'exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " [Citations.] [¶] [Code of Civil Procedure s]ection 473 is often applied liberally where the party in default moves promptly to seek relief, and the party opposing the motion will not suffer prejudice if relief is granted. [Citations.] In such situations "very slight evidence will be required to justify a court in setting aside the default." [Citations.] [¶] Moreover, because the law strongly favors trial and disposition on the merits, any doubts in applying [Code of Civil Procedure] section 473 must be resolved in favor of the party seeking relief from default [Citations]. Therefore, a trial court order denying relief is scrutinized more carefully than an order permitting trial on the merits. [Citations.]' " (*McCormick* v. *Board of Supervisors, supra,* 198 Cal.App.3d at pp. 359-360 citing, *Elston* v. *City of Turlock* (1985) 38 Cal.3d 227, 233 [211 Cal.Rptr. 416, 695 P.2d 713].)

■■ Here, Miller sought relief from default on the ground of mistake of law, since she apparently did not understand that her requests for hearing on injunctive relief did not satisfy the requirements of Public Resources Code section 21167.4. ■■ " 'An honest mistake of law is a valid ground for relief where a problem is complex and debatable.' " (*McCormick* v. *Board of Supervisors, supra,* 198 Cal.App.3d at p. 360 citing, *Brochtrup* v. *INTEP* (1987) 190 Cal.App.3d 323, 329 [235 Cal.Rptr. 390].) The controlling factors in determining whether a mistake is excusable are: (1) the reasonableness of the misconception; and (2) the justifiability of the failure to determine the correct law. (*Ibid.*; *Dunn-Edwards Corp.* v. *Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644, 652-653 [11 Cal.Rptr.2d 850].)[14]

■■ We find that Miller's mistake of law is excusable. Contrary to assertions by respondents, the type of hearing required to be noticed within

---

[14]In *Dunn-Edwards Corp., supra,* petitioners failed to request a hearing within 90 days of the transfer of their case from Los Angeles to San Francisco Superior Court. Petitioner never received notice of said transfer and, on appeal, the failure to comply with section 21167.4 of the Public Resources Code was held to be excusable neglect based on mistake of law.

90 days under CEQA is not spelled out in the statutes or in any reported decision. While we have concluded that a hearing on the ultimate merits of the petition for writ of mandate should be noticed in order to best serve the public interest in resolving CEQA matters expeditiously, that result was not self-evident. A petitioner's counsel might reasonably presume that so long as the petition is prosecuted diligently on the merits, the purpose of the 90-day limitation is satisfied.

The instant case, unlike *McCormick*, does not involve a "mere declaratory statement" or an "idle act" involved in filing a request for hearing without a date certain, which does not amount to "affirmative steps sufficient to place the matter on the court's docket for a hearing, either by filing and serving a notice of hearing or utilizing some other method authorized by the local rules of the court in which the matter is pending."[15] (*McCormick v. Board of Supervisors, supra,* 198 Cal.App.3d at p. 358.) In contrast, Miller noticed a minimum of three hearings pertaining to the substantive issues embodied in her petition: the hearing on her application for a temporary restraining order, the hearing on her order to show cause re preliminary injunction, and the hearing on her motion for reconsideration of the order denying her request for preliminary injunction. In addition, Miller filed written opposition to demurrers filed by respondents. The hearing on the demurrers was not held until June 24, 1991, four days prior to the expiration of the ninety-day cutoff. Miller's misconception that the demurrers should be heard before the trial on the merits of the petition was not unreasonable. The record makes plain that Miller's behavior was not dilatory. Her preoccupation with obtaining an injunction to prevent construction and possible adverse environmental impacts involved a great deal of litigation activity on her part. We conclude, therefore, that her mistake of law was both justifiable and reasonable.

We must also consider the degree of Miller's diligence in prosecuting this matter in reviewing the denial of Miller's Code of Civil Procedure section 473 motion requesting relief from default. (*McCormick v. Board of Supervisors, supra,* 198 Cal.App.3d at p. 361.) Miller unquestionably prosecuted this matter diligently during the 90-day period. On receipt of HBIC's motion for judgment on the pleadings, she promptly filed her request for hearing. Her request was ultimately filed only 14 days late. Neither HBIC nor the City presented evidence that this delay had prejudiced them in any way. They contended only that Miller's failure to request the preparation of the administrative record constituted lack of diligence on her part. Miller contended that no administrative record needed to be prepared, since there had been no administrative hearing (as described in Code Civ. Proc., § 1094.5).

---

[15]The decision in *McCormick* may also be distinguished on the ground that relief was granted to petitioner under section 473 of the Code of Civil Procedure.

It is not clear in this case what constitutes the administrative record which needed to be prepared, since no public or evidentiary hearings were conducted or required to be conducted in connection with the issuance of the challenged order, the building permit. ■ We are compelled to resolve any doubts on this issue in favor of the party seeking relief from default. ■ We note also the record does not indicate that either HBIC or the City timely requested[16] to meet and confer to settle the lack of an administrative record or to prepare a settlement statement to be filed with the court as required by Public Resources Code section 21167.8. This is fairly persuasive evidence that the City and HBIC were not prejudiced in any way by the delay and were, perhaps, not diligent themselves in resolving the matter.

Thus, we conclude that the trial court abused its discretion in failing to grant relief from default.

*Denial of the Request for Preliminary Injunction*

■ Because the order denying the request for a preliminary injunction is not mooted by the subsequent dismissal of Miller's petition which we hereby reverse, we must determine whether the trial court erred in failing to issue the preliminary injunction. ■ In determining whether to grant or deny a request for preliminary injunction, a trial court must consider the likelihood that the plaintiff will prevail on the merits at trial and weigh the interim harm to the plaintiff if the injunction is denied against the harm to the defendant if the injunction is granted. (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1560-1561 [11 Cal.Rptr.2d 222].) Where the trial court engages in both parts of this analysis, an order granting or denying a preliminary injunction will be reversed only for abuse of discretion.

However, where, as here, the trial court considered only the legal issue of likelihood of success on the merits, then the appeal presents a question of law which we review de novo. (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.*, *supra*, 8 Cal.App.4th at p. 1561.) ■ In the case at bar, the trial court rested its denial of the request for preliminary injunction solely upon its analysis that plaintiff would not likely prevail on the merits, accepting respondents' argument that the hotel project at issue was exempt from the requirements of CEQA as a "ministerial," not "discretionary," project. Our review of the record reveals that the material facts have never been contested by the parties.

"Ministerial" is broadly defined in the Guidelines as: "[A] governmental decision involving little or no personal judgment by the public official as to

---

[16]That is, within 20 days after service of the petition for writ of mandate.

the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or judgment in reaching a decision. A ministerial decision involves only the use of fixed standards or objective measurements, and the public official cannot use personal, subjective judgment in deciding whether or how the project should be carried out. Common examples of ministerial permits include automobile registrations, dog licenses, and marriage licenses." (Cal. Code Regs., tit. 14, § 15369.)

The Guidelines define "ministerial" projects as including the issuance of a building permit, "if the ordinance requiring the permit limits the public official to determining whether the zoning allows the structure to be built in the requested location, the structure would meet the strength requirements of the Uniform Building Code, and the applicant has paid his fee." (Cal. Code Regs., tit. 14, § 15369.) In contrast, a discretionary project is defined as "a project which requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations." (*Id.* at § 15357.) Where a project has both ministerial and discretionary elements, it must be deemed to be discretionary and is subject to the requirements of CEQA. (*Id.* at § 15268; *Friends of Westwood, Inc.* v. *City of Los Angeles* (1987) 191 Cal.App.3d 259 [235 Cal.Rptr. 788].)

If Miller is correct that the issuance of the building permit in this case constitutes a discretionary project, then it is reasonably probable she will prevail on the merits of her petition. This issue was squarely presented in *Friends of Westwood, Inc.* v. *City of Los Angeles, supra,* 191 Cal.App.3d at page 270. "[T]he touchstone is whether the approval process involved allows the government to shape the project in any way which would respond to any of the concerns which might be identified in an environmental impact report. And when is government foreclosed from influencing the shape of the project? Only when a private party can *legally compel* approval without any changes in the design of its project which might alleviate adverse environmental consequences." (*Id.* at p. 267.)

In *Friends of Westwood, Inc.,* discretion was exercised when city employees determined "adequate" ingress and egress from the proposed office tower; modified the access driveways to minimize traffic problems; developed internal parking standards to minimize external traffic problems; allowed departures from city council standards (e.g., eliminating separate elevator vestibules and allowing an opening between basement and upper

floors); exempted the project from the requirement that it fall within a specific plan in order to be consistent with the city's general plan; and, most importantly, drew an imaginary line through the building and treated it as two separate buildings in order to satisfy the density ratios of the two planning areas in which the building fell.[17]

Other decisions also address the discretionary/ministerial issue. In *Day* v. *City of Glendale* (1975) 51 Cal.App.3d 817, 824 [124 Cal.Rptr. 569], the issuance of a grading permit was determined to be a discretionary project under CEQA. "CEQA must be interpreted to afford the fullest possible protection to the environment within the reasonable scope of statutory language. (*Friends of Mammoth* v. *Board of Supervisors* [(1972)] 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) [¶] We do not believe the Legislature intended to exclude from the ambit of CEQA any project involving, as here, cut, movement, and fill of massive sections of earth . . . . The issuance of the grading permit is the only point at which the environmental impact of the project may be publicly considered before mountains are moved and 70 acres of canyon are filled." (*Day* v. *City of Glendale, supra,* at pp. 823-824.)

In *People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185 [119 Cal.Rptr. 266], a construction permit to build a mobile-home park, although governed by fixed design and construction specifications embodied in statutes and regulations, also was found to involve more general standards, such as whether the site was well drained and graded, and were "addressed to the sound judgment and enlightened choice of the administrator," rendering the project a mixed ministerial/discretionary one. (*Id.* at p. 193.) In such mixed situations, CEQA's EIR requirements apply. (*Ibid.*)

In the case at bar, we agree with Miller that certain aspects of the hotel building permit process indicate that discretion was exercised by City employees. The record indicates City employees had "many concerns" about HBIC's goal of "avoid[ing] discretionary approvals requiring environmental assessment"[18] and initially advised that the project would be subject to an environmental assessment. In fact, the Conditions of Approval attached to the November 15, 1989, Approval in Concept of the hotel project seemed to

---

[17]Apparently, the building straddled two different planning areas, the specific plan area and the community plan area. The alternative would have been for the city to amend the specific plan or to adjust the boundaries between areas, either of which would have invoked the EIR provisions of CEQA. (*Friends of Westwood, Inc.* v. *City of Los Angeles, supra,* 191 Cal.App.3d at pp. 275-276.)

[18]We refer to the August 2, 1989, letter (quoted *ante,* at Facts and Procedural Background) from the City manager to HBIC.

address many of the anticipated environmental impacts and to propose solutions reflecting the exercise of discretion by City officials. In other instances, the conditions demanded that certain anticipated impacts be subject to study by outside consultants, the results of which would be reported to the City and analyzed for further action.

For example, HBIC was required to obtain a traffic engineering impact analysis of vehicle and pedestrian circulation, to be prepared by a licensed traffic engineer. No groundwater was to be allowed in the storm drain system during dewatering,[19] or to flow across the surface of the public beach. A soil settlement analysis was to be performed by a licensed soils engineer. That engineer was to determine and submit a plan showing the potential zone of influence for settlement, and a monitor was to be provided to determine the extent of subsidence. HBIC was to provide an engineering analysis of the peak capacity flows in the sewer line downstream from the hotel site and to evaluate the anticipated impacts. The City expressly retained the complete right to approve all aesthetic elements of the architectural design, colors and materials of the hotel project, as well as the landscaping plan. These conditions, taken as a whole, illustrate beyond peradventure that the issuance of the building permit for the hotel project was a discretionary project under CEQA, as defined in the regulations and applicable case law. Our finding is consistent with the initial judgment of the City manager, the City planning director and staff, and the City attorney, who determined that the project would involve discretionary review. The record does not explain the shift from this position, or why, at a minimum, a supplemental EIR or an addendum to the 1984 EIR was not prepared.[20]

The subject project is a very large, unique use, to be situated at or near a public beach, which is obviously an environmentally sensitive location. It appears from the record that the project is adjacent to private properties which may be subject to subsidence occasioned by the massive excavation for the underground parking garage. The viability of the storm drain system was implicated by the dewatering necessary during construction. Traffic impacts different from the original hotel proposal were identified. Questions were raised as to the impact of the hotel's waste water on the sanitary sewer line. As in *Friends of Westwood, Inc., supra,* we are confronted with a public agency which has "shape[d] the project" in ways "which might be identified

---

[19]We agree with Miller that the ultimate elimination of this condition and substitution of a monitor itself constitutes an act of discretion by City officials.

[20]Respondents have not contended that the City affirmatively determined that no supplemental EIR or addendum needed to be prepared. Our standard of review in that instance would have been merely to determine whether substantial evidence supported the lead agency's determination. (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 [230 Cal.Rptr. 413].)

in an environmental impact report." HBIC could not "legally compel approval" of the hotel project without changes in the design of the project which "might alleviate adverse environmental consequences." Thus, the project was discretionary and not ministerial and fell within the ambit of CEQA. An EIR[21] should have been prepared to deal with any and all changes from the design which was the subject of the 1984 EIR, or the City should have issued a negative declaration. The project was not statutorily exempt from the requirements of CEQA.

In our view, it is reasonably probable Miller will be able to prove the building permit process for the hotel project was a "discretionary project" within the meaning of CEQA, and that the EIR requirements of CEQA apply.

We reject any contention, on the record before us, that the Coastal Commission review constituted a "functional equivalent" of an EIR. CEQA sets forth requirements for such a "functional equivalent" and the record does not reflect that those requirements were met in this case. (See Pub. Resources Code, § 21080.5, subd. (d)(3)(i).)[22] In addition, the record does not clearly establish the nature of the Coastal Commission review. In fact, the record appears to demonstrate that the Coastal Commission performed no EIR-type analysis, relying on the lead agency's determination that the project was "categorically exempt" and no EIR needed to be prepared. Finally, the City and HBIC have steadfastly maintained that no EIR was required since the project was statutorily exempt. Thus, it is probable that Miller will prevail on this argument during the hearing on her petition.

We also reject the contention that Miller is not likely to prevail because the 1984 EIR satisfied the requirements of CEQA. The record does not reflect that the 1984 EIR was properly certified for use in connection with this hotel project, with opportunity for public hearing and comment. Further, the 1984 EIR is not part of the record in this case.

Finally, we reject respondents' argument that Miller's petition for writ of mandate was barred by CEQA's 180-day statute of limitations. (Pub. Resources Code, § 21167, subd. (a).) CEQA's statute of limitations begins to

---

[21]By this term we mean to include an EIR, subsequent EIR, supplemental EIR and addendum to EIR, as those terms are defined in the Guidelines.

[22]Nor does the record establish that the granting by the Coastal Commission of a development permit falls within the exemption for certified state regulatory programs (Guidelines, § 15251, subd. (c) or (f)) or that this project was part of the preparation and adoption of a local coastal program (Guidelines, § 15265, subd. (a)(2)), and thus, exempt from CEQA. With respect to the Coastal Commission's exemption for granting of development permits, the record does not contain any part of the environmental analysis performed by the Coastal Commission.

run when the public agency "is carrying out or has approved a project" and an "action or proceeding" shall be commenced within 180 days of the public agency's decision to carry out or approve the project (*ibid.*). The decision to approve the hotel project was not the issuance of the Approval in Concept on November 15, 1989, as respondents assert, but rather, the issuance of the building permit on November 26, 1990. The Approval in Concept was not a building permit, and had numerous substantive conditions attached. Failure to satisfy any of these conditions would bar the issuance of the building permit, which is the formal, legally enforceable event. We note also that the conditions attached to the building permit were different from those which attached to the Approval in Concept. Finally, the evidence does not reflect that the Approval in Concept was of such a public nature that it would be subject to a writ of mandate proceeding by a concerned citizen.

We conclude the trial court erred in determining as a matter of law that the issuance of the building permit constituted a ministerial action and, therefore, it was not reasonably probable Miller would prevail on the merits of her petition for writ of mandate. Since the trial court did not engage in a balancing of the harms analysis, we would ordinarily remand this matter for a hearing on that issue and determination whether a preliminary injunction should issue pending a final judgment on the petition. However, respondents were given a full opportunity in the trial court to present evidence on and brief this issue and failed to identify any significant harm which would result from the issuance of a preliminary injunction. Since the material facts pertaining to the hotel project are not seriously disputed, in the interest of judicial economy (*Department of Fish & Game* v. *Anderson-Cottonwood Irrigation Dist.*, *supra*, 8 Cal.App.4th at p. 1561), we have undertaken the required balancing on the record before us and conclude that an injunction should issue.[23]

## DISPOSITION

The order denying relief from default and the judgment of dismissal are reversed. The trial court is ordered to vacate its orders granting judgment on the pleadings and to enter new and different orders denying the motions for judgment on the pleadings. The order denying the request for a preliminary injunction is reversed. The trial court is ordered to vacate its order denying the request for preliminary injunction and enter a new and different order granting the request. The matter is remanded for further proceedings consistent with this opinion, including a hearing on the setting of an appropriate

---

[23]"[T]he conventional 'harmless error' standard has no application when an agency has failed to proceed as required by the CEQA. [ ] Failure to comply with the CEQA procedures is necessarily prejudicial." (*Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 897-898 [236 Cal.Rptr. 794].)

bond for the preliminary injunction and a hearing on the petition for writ of mandate. Miller shall recover her costs on appeal from HBIC and the City.

Turner, P. J., and Boren, J.,* concurred.

---

*Presiding Justice of the Court of Appeal, Second District, Division Two, sitting under assignment by the Chairperson of the Judicial Council.