[No. A082256. First Dist., Div. Four. Apr. 28, 1999.]

COUNTY OF DEL NORTE, Plaintiff and Respondent, v.
CITY OF CRESCENT CITY, Defendant and Appellant.

**COUNSEL**

Dohn R. Henion, City Attorney, for Defendant and Appellant.

Livingston & Mattesich, Steven P. Belzer and S. Craig Hunter for Plaintiff and Respondent.

**OPINION**

**REARDON, J.**—Appellant City of Crescent City (City) owns and operates a water system for the benefit of its residents. Over the years it has also served private customers and several water districts in the unincorporated area of respondent County of Del Norte (County). During the decade of the 1990's, the parties have experienced increasing political differences over the issues of whether, on what terms and to what extent the City should continue furnishing new water service connections outside city limits. In July 1997 the city council enacted a policy that it would "no longer allow new utility connections outside its incorporated territory . . . ." (Bold print omitted.) The County responded with an action in mandate and for injunctive relief seeking rescission of the policy and an order directing the City to provide new service connections to the unincorporated area. Upon concluding that the policy was arbitrary, the trial court granted the requested relief. We reverse the judgment.

## I. FACTS

In the 1950's, the City purchased a private water system that had its source in muddy wells near the local cemetery. Apparently this system was

unregulated and operating without a license. Some of the customers of the private water system were located in the unincorporated area but most were within city limits.

The City determined to improve the system. Its residents voted to approve issuance of a general obligation bond to fund construction of a collector at the Smith River and a transmission line with pumps and elevated tanks.

The City then applied for a permit from the State Water Resources Control Board (Board). The Board approved permit No. 11475 in May 1958 subject to vested rights, a specified maximum appropriation, and a designated "place of use" that included acreage both within and outside City limits. The City continued supplying water within the City and extraterritorially, through its public works department.

The City adopted a general plan in 1972. The plan expressed the philosophy that the City's utilities were the strongest tool at its disposal to manage growth: "Therefore, the City should not jeopardize its own viability or ability to manage growth in and around the City by overcommitting the capacity of its systems outside of the City limits. However, the City should expand its utility systems in order to strengthen its ability to manage growth, by use of these systems."

The average daily consumption of water in 1982 was 928,000 gallons per day, increasing to 2.5 million gallons per day by 1992. At that time the maximum daily demand was 3.6 million gallons per day, for a water system with a transmission capacity of 2.6 million gallons per day.

By 1990, roughly two-thirds of the City's approximately 3,600 customers were located in the unincorporated area of the County. The County itself does not have any facilities for providing water in this area; nor does it have the resources to build its own system. According to City Manager Steven Casey, from a policy perspective, allowing hookups outside the City encouraged development of new businesses and residential units there while discouraging growth within the City proper. This situation negatively impacted the City's revenue stream from sales tax and subvention funds.

In September 1990 the city council adopted an interim water policy which allocated first priority service to new water users within incorporated City limits; disallowed services to major users outside City limits except with specific agreement and terms; and permitted other service connections in unincorporated areas only upon findings of need and that the system had sufficient water for the development.

In 1992 the City experienced water shortage problems, which led the city council to declare a moratorium on connections to the water system. The moratorium applied across the board to both City and County properties. The system experienced capacity problems several years later during the summer of 1994, at which time two booster pumps operated during high demand periods.

As a result of the 1990 interim water policy, negotiations began between the parties that eventually led to a revenue-sharing agreement. This agreement enabled the City to share in County sales tax growth in exchange for the City's commitment not to discriminate between City and non-City users in allowing utility connections. The voters ratified the revenue-sharing agreement in June 1994. According to the city manager, this agreement generated approximately $60,000 for the City in shared sales tax revenues.

In October 1996 the County enacted Ordinance No. 96-20, which in turn adopted title 13, division 1 of the City's municipal code relating to provision of water to residents in unincorporated areas. Section 13.04.040A of the City's municipal code, as adopted by the County, states: "The city will furnish water service . . . to any property within the corporate limits of the city and to such areas outside the city limits as the council may designate."

The County withdrew from the revenue-sharing agreement effective June 1997.

Meanwhile, in February 1997 the Regional Water Quality Control Board (RWQCB) directed the City to correct certain violations associated with its wastewater system. City officials anticipated that the Board would also prohibit further waste-producing attachments to the system. Sewer hookups follow as a matter of course from new water hookups. Thus when more water is issued, more sewage is created, potentially placing the City in jeopardy of RWQCB sanctions.

On July 8, 1997, the city council noticed a special meeting for July 10 to consider alternatives and strategies for operation and expansion of its water system and wastewater facilitates. The city manager provided the city council with a detailed analysis of issues relating to the water and wastewater systems. Therein he explained that the City had decided to proceed with a proposed $9 million water system upgrade project to benefit the incorporated and unincorporated areas with sufficient water to meet anticipated needs for the next 15 to 20 years. Toward this end the City had expended "considerable funds" working up the project to the point of advertising for bids and arranging for a $4 million loan from rural development.

The city manager went on to state: "The City has invested considerable time, money, and resources in providing regional infrastructure. It is the accepted standard throughout the state that municipal utilities are a service that are provided to residents of the incorporated area and act as an inducement for annexation of developing areas. Thus providing regional infrastructure to the County has been contrary to the best interests of the City and its residents. Also noteworthy is the County['s] apparent lack of concern and cooperation for the growth problems that county expansion has caused the City in staff time expenditures and increased utility rates to the City residents to assist the county to continue its expansion."

The city manager recommended that the City should immediately stop providing water or sewer connections outside City limits, unless specifically required by contract, agreement or prior commitment. The rationale was as follows: "There is no longer an agreement between the City and County on revenue sharing. Without such an agreement, it is not logical for the City to continue to provide utilities to County areas which compete with City businesses and development. No services to the County areas should be allowed without a revenue sharing agreement."

Several persons presented public testimony at the July 10 hearing, including a County supervisor. The city council adopted, by motion, the above policy, namely that "effective immediately the City will no longer allow new utility connections outside its incorporated territory . . . ." (Bold print omitted.)

Two weeks later, County Counsel Kathleen L. Burgess complained to the Board that the City's newly enacted policy violated its water appropriation permit. She asked the Board to issue a cease-and-desist order against the City, "requiring it to comply with the terms of the water permit to provide water to the entire service area . . . ." The Board responded that the permit "does not require the City to serve the entire [authorized place of use] or use all of the water. Consequently, the City's decision to limit the area to which it delivers water is not a violation of the terms of Permit 11475. The subject of the City's obligation to provide service throughout its authorized service area may be subject to Public Utilities Commission . . . jurisdiction or other statutes."

On January 20, 1998, the County petitioned for writ of mandate and other relief. The County sought rescission of the policy, prohibition against its enforcement and a directive commanding the City to provide new water service connections outside City limits on a nondiscriminatory basis.

The trial court granted a temporary restraining order and issued an order to show cause why a preliminary injunction should not issue. As a result of

the temporary restraining order, a motel that previously had been turned down for a water connection received one. Had the motel been required to proceed with annexation, the City would have received transient occupancy tax estimated between $50,000 and $100,000 annually.

At the hearing on the order to show cause, the county administrator testified that there were a number of development projects approved by the County that could not go forward because of the City's policy. He surmised that restricting water connections could impact county services and result in loss of revenue from reduced real property, sales and occupancy taxes due to "the lack of the ability of the community to encourage retention of business, the expansion of business or the bringing of business into the community." As well, the County was responsible for finding or creating 900 new jobs for individuals leaving the welfare rolls. Construction jobs would not be forthcoming for these people without water hookups.

The trial court characterized the City's policy this way: "So basically it's blackmail?" Concluding that the City's decision to stop providing water hookups outside city limits was a result of failure to agree on modifications to the revenue-sharing agreement and not for purposes of conserving water, the court went on to say: "It appears that the decision is based solely on the desire to require new hook ups to annex to the city. Counsel stated that is a legal means that the city may use. It may be legal. But is it moral? Is it not arbitrary to deny solely because one is on the other side of the city boundary line and for no other reason?" Not surprisingly, the court granted all the relief which the County requested. This appeal followed.

## II.  Discussion

### A.  *Judicial Review in Trial Court; Standard of Review on Appeal*

■  Code of Civil Procedure section 1085 permits judicial review of ministerial as well as legislative acts. Mandate will lie to compel performance of a clear, present and usually ministerial duty in cases where a petitioner has a clear, present and beneficial right to performance of that duty. (*Gilbert* v. *State of California* (1990) 218 Cal.App.3d 234, 241 [266 Cal.Rptr. 891].)

■  Mandate will also lie to correct the exercise of discretionary legislative power, but only if the action taken is fraudulent or so palpably unreasonable and arbitrary as to reveal an abuse of discretion as a matter of law. (*Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education* (1974) 12 Cal.3d 851, 856 [117 Cal.Rptr. 537, 528 P.2d 353]; *United Assn.*

*of Journeymen* v. *City and County of San Francisco* (1995) 32 Cal.App.4th 751, 768 [38 Cal.Rptr.2d 280].) This test is highly deferential, as it should be when the court is called upon to interfere with the exercise of legislative discretion by an elected governmental body. (*United Assn. of Journeymen* v. *City and County of San Francisco, supra*, at p. 768.) Legislative enactments are presumed to be valid; to overcome this presumption the petitioner must bring forth evidence compelling the conclusion that the ordinance is unreasonable and invalid. (*Corona-Norco Unified School Dist.* v. *City of Corona* (1993) 17 Cal.App.4th 985, 993 [21 Cal.Rptr.2d 803].)

■ In a mandate proceeding, the trial court's findings as to foundational facts are conclusive if supported by substantial evidence. (*Helena F.* v. *West Contra Costa Unified School Dist.* (1996) 49 Cal.App.4th 1793, 1799 [57 Cal.Rptr.2d 605].) Thereafter we perform essentially the same function as the court below, determining if the local entity's action was arbitrary or palpably unreasonable.

■ A permanent injunction is an equitable remedy, not a cause of action, and thus it is attendant to an underlying cause of action. (*Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 356 [176 Cal.Rptr. 620].) The remedy is available in a mandamus proceeding and is appropriate to restrain action which, if carried out, would be unlawful. (*Id.* at pp. 356-357.)

The outcome of this appeal pivots on two issues: (1) whether the City had a duty to provide new water hookups on a nondiscriminatory basis without regard to territorial bounds; and (2) whether the policy confining new water hookups to properties within its borders was arbitrary or palpably unreasonable. If there was no duty, we must still address the validity of the ordinance. If, as the trial court concluded, the policy was arbitrary, then the validity of the writ and injunction follow as a matter of course. On the other hand if, as we conclude, there was no duty and the policy was sound, then the writ and injunction fail.

B.  *The County Had No Duty to Furnish New Hookups to the Unincorporated Area*

■ The County takes the position that state law mandates water service to beneficiaries unless there is a water shortage, citing Water Code[1] section 1825 and the water moratoria statutes found at sections 350-358.[2] Section 1825 is not the imperative the County thinks it is. This statute expresses the

[1]Unless otherwise indicated, all further statutory references are to the Water Code.

[2]Contrary to the County's assertion, the City's action was not a declaration of a water shortage emergency pursuant to section 350 and thus it was not subject to procedures and

legislative policy "that the state should take vigorous action to enforce the terms and conditions of existing permits and licenses to appropriate water and to prevent the unlawful diversion of water." (§ 1825.) The ensuing provisions then empower the Board to issue cease-and-desist orders to compel compliance with the terms and conditions of a permit or license. Ironically, the County relied on these provisions when it entreated the Board to issue a cease-and-desist order against the City requiring it to "comply with the terms of the water permit to provide water to the entire service area as authorized by Water Code section 1831." As we know, the Board responded that the decision to limit the area eligible for new water connections did *not* run afoul of the terms of the permit.

The Board's pronouncement notwithstanding, the County seizes on the City's status as the acquirer of a private water system as the foothold for its purported duty to provide water service to all potential users in the entire "place of use" designated in the permit. The cases cited by the County and noted in the footnote below[3] broadly embrace the principle that a municipality or other entity that takes over a water company must continue to serve those who have a right to receive water from that company.

---

standards governing such moratoria. The water moratoria statutes grant the distributor of a public water supply the discretion to decide the proper measures of water conservation *during times of emergency*. (§§ 353, 354, 356; *Building Industry Assn.* v. *Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1646-1648 [1 Cal.Rptr.2d 625].) Although water capacity limitations are an issue with respect to the City's current water supply system, in passing the service limitation measure, the city council made it clear that it was *not* declaring an emergency water moratorium.

Moreover, although section 356 permits a water supplier to deny new or additional service connections, we see nothing in the moratoria statutes to suggest that a municipality can *only* *restrict* the area for new services within the "place of use" under an existing permit by declaring a water shortage emergency condition pursuant to these statutes. Indeed, section 357 makes it clear that the moratoria provisions prevail over any conflicting law relating to water rights *only* "for the duration of the period of emergency . . . ." The purpose of the City's service limitation measure is distinct from the purpose of the water moratoria statutes. Thus, there is no conflict between them and, again contrary to the County's contention, preemption does not come into play. (See *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 148-149 [130 Cal.Rptr. 465, 550 P.2d 1001].)

[3]See (1) *People* ex rel. *City of Downey* v. *Downey County Water Dist.* (1962) 202 Cal.App.2d 786 [21 Cal.Rptr. 370] (involving challenge to existence of a county water district after its entire area had been annexed to a city. On the issue of continued service, the reviewing court held that ". . . the transferee of a water company or a water system has the same duties and obligations as the transferor, and the inhabitants of the district have the right to receive water from the city to the same extent they formerly had [citations]; and the city must assume the duty to supply water without discrimination. [Citation.]" (*id.* at p. 797)); (2) *San Bernardino etc. Water Dist.* v. *Meeks & Daley Water Co.* (1964) 226 Cal.App.2d 216, 222-223 [38 Cal.Rptr. 51] (statutory right of municipal water district to condemn the water rights of a private water company carries countervailing duty to continue water services to shareholders of condemned company); (3) *Hansen* v. *City of San Buenaventura* (1986) 42 Cal.3d 1172, 1188-1189 [233 Cal.Rptr. 22, 729 P.2d 186] (holding that a city acquiring the

However, the County asks us to embrace the specific holdings of these various cases without regard to the constitutional, statutory or contractual authority under which the grantee and grantor operated, and without any parallel analysis of the statutory authority under which the City operates its water system. This we will not do.

To begin with, we know nothing about the terms of operation of the private, unlicensed, unregulated system that the City acquired. Its source was muddy wells near the cemetery. As to the area served by that system, all we know is that most customers were located within the City but some were in the unincorporated area; we do not know the overall boundaries of the service area. Upon taking over a water system sourced in muddy wells, the City submitted a general obligation bond measure to City residents for system improvements and applied for and received a permit from the Board. That permit was a permit to appropriate unappropriated water (§§ 1252, 1253), not a permit to provide water from the muddy wells. The permit identified the source as a Smith River tributary. As well, it designated the location of the "place of use."

From these facts it is apparent that there is no grounding for the County's contention that inhabitants of the unincorporated area have a right to *new* hookups today by virtue of the City's purchase of a private, unregulated water system in 1958 with a different source and undefined service area and terms. For purposes of our analysis, it is as if the City started from scratch as a water provider when it financed system improvements through a general obligation bond and then received its permit from the Board. This is the point in time in which it became subject to cognizable statutory and regulatory authority, as follows.

Cities are authorized by statute to acquire and operate domestic water supply facilities. (Gov. Code, §§ 38730, 38742.) A municipality such as the City which operates a water utility has discretion to sell water outside its corporate limits if there is an excess beyond the amount necessary for the municipality and its inhabitants. (See Pub. Util. Code, § 10005.)

---

water system of another community was under the same obligation as the grantor to continue the service and supply water to all who may become entitled to it in the future).

The County also refers us to *Lukrawka* v. *Spring Valley Water Co.* (1915) 169 Cal. 318 [146 P. 640], involving an action to compel a water company to extend its mains, where its predecessor had been organized, and accepted a franchise under, "the act of 1858," for purpose of supplying the City and County of San Francisco and the inhabitants thereof with water. (Held: Petitioners, being inhabitants of the City and County of San Francisco, were entitled to the extension. By accepting the franchise, the original franchisee undertook to serve the needs of all inhabitants as they arose and the proper discharge of this duty compelled the company to anticipate the natural growth of the municipality it had undertaken to serve as a whole and take reasonable steps to accommodate such growth.) (*Id.* at pp. 322, 325, 331-332.)

Applicants, such as the City, seeking to appropriate unappropriated water must submit an application to the Board which sets forth, among other items, "[t]he nature and amount of the proposed use" (§ 1260, subd. (c)) and "[t]he place where it is intended to use the water" (*id.*, subd. (f)). If the use is for municipal water supply, the applicant must state the present population to be served with an estimate as to future requirements of the city. (§ 1264.) "Municipal use means the use of water for the municipal water supply of a city, town, or other similar population group, and use incidental thereto for any beneficial purpose." (Cal. Code Regs., tit. 23, § 663.)

The permit issued by the Board to the City authorized a "place of use" extending beyond City limits. Board records indicate that the nature of the use is "Municipal." As the City had enough water under the appropriation permit, it sold water to its residents and also to private customers and several water districts located outside City limits. This was a voluntary effort, not mandated by its status as a municipal water provider or by its operating permit. The Board has gone on record that the permit does not require the City to serve the entire "place of use" and thus its service limitation policy does not violate the terms of the permit.

The "place of use" authorized by the Board pursuant to a water appropriation permit is not equivalent to the "service area" associated with a privately owned public utility. The latter is an area served by such utility "in which the facilities have been dedicated to public use *and in which territory the utility is required to render service to the public.*" (Pub. Util. Code, § 1502, subd. (b), italics added.) Privately owned public utilities "franchised under the Constitution or by a certificate of public convenience [issued by the Public Utilities Commission][4] . . . to provide water service . . . *must provide facilities to meet the present and prospective needs of those in its service area who may request service.*" (Pub. Util. Code, § 1501, declaration of Legislature, italics added.) On the other hand, while the appropriation of water pursuant to a permit must be for a beneficial purpose (§ 1240), the "place of use" authorization thereunder does not confer on the permitee an obligation to serve the entire territory so designated. Thus, persons coming into unincorporated lands within the "place of use" do not have a vested right to *new* service under the terms of the permit.

## C. *The Policy Was Not Arbitrary*

■ The trial court dubbed the policy "arbitrary" because it denied water to potential users in the unincorporated area "solely" for the reason that they were outside rather than inside the City's corporate boundaries. The City challenges this ruling on several grounds.

---

[4]Public Utilities Code section 1001 et seq.

First, the parallel water ordinances enacted by the parties compel the City to supply water to properties within corporate limits, but vest discretion in the city council to designate any areas it would serve beyond its borders. Having acceded in the City's authority to differentiate between corporate and outlying areas with respect to its obligation to furnish water, how can the County complain now that the city council has exercised this authority?

More importantly, there was a basis in reason for acting as it did. The County was entitled, under the revenue-sharing agreement, to withdraw from the agreement when it did, but that withdrawal carried consequences. As reflected in the minutes of the city council's July 10, 1997, special meeting, the County's decision eliminated "any financial incentive the city may have had to continue providing utilities in county areas which compete with city businesses and development."

Supplying new hookups on a regional basis without requiring annexation and without a revenue-sharing agreement gives the County the upper hand in managing economic growth and reaping the tax revenue benefits therefrom. Additionally, if new subdivisions do not have to apply for annexation to gain access to City water, the City loses out on increased subvention funding from the state based on population increase. In effect the County expects the City to undertake to become a full-fledged regional water provider in the face of the City's determination to concentrate on City service and City growth, while continuing to serve existing nonresident customers.

It is not against the law or public policy to use utilities as a tool to manage growth. For example in *Dateline Builders, Inc.* v. *City of Santa Rosa* (1983) 146 Cal.App.3d 520 [194 Cal.Rptr. 258], a developer filed suit for relief arising out of a city's refusal to extend its existing sewer line to a proposed "leap frog" development beyond city boundaries (*id.* at p. 523). The reviewing court held that the city could use the sewer hookup as a "planning device" to manage growth. (*Id.* at pp. 528-531.) "Neither common law nor constitutional law inhibits the broad grant of power to local government officials to refuse to extend utility service so long as they do not act for personal gain nor in a wholly arbitrary or discriminatory manner." (*Id.* at p. 530.)

Capacity issues related to the water system furnished another reasonable basis for the City's service limitation policy. The system is a City-owned and operated municipal water system. The City's first duty, as reflected in the applicable City and County ordinances, is to its own residents, who funded the system in the first place. Existing customers, wherever located, also have a right to continued service. A proposed multimillion-dollar water

system upgrade was on the table. The City was under a cease-and-desist order from the RWQCB with respect to its wastewater system. Under these circumstances it was not unreasonable for the City to reserve new connections for City residents and businesses.

### D. *There Is No Other Basis for Upholding the Judgment*

#### 1. *Brown Act Violations*

The County contends that the July 10, 1997, policy is void because the notice of special meeting to consider its adoption was inadequate, misleading and in violation of the Ralph M. Brown Act (Brown Act). (Gov. Code, § 54950 et seq.) The stated intent of the Brown Act is that the actions of public commissions, boards, councils and agencies "be taken openly and that their deliberations be conducted openly." Thus, among other things, meetings of local legislative bodies must be open and public (*Id.* § 54953, subd. (a)) and the legislative body must post a descriptive agenda of regular meetings (*Id.* § 54954.2, subd. (a)) and a call and notice specifying the business to be transacted or discussed for special meetings, all within particular time frames (*Id.* § 54956).

Prior to pursuing judicial determination that an action in violation of the Brown Act is null and void, an interested person or the district attorney must first demand that the legislative body cure or correct its mistake. (Gov. Code, § 54960.1, subds. (a), (b).) Depending on the particular violation, the demand must be made within 30 or 90 days from the date of the action. (*Id.*, subd. (c)(1).) Suit can then be brought within 15 days of receiving written notice of a decision to cure or correct, or not to cure or correct, or within 15 days of expiration of the 30-day cure period—whichever happens first. (*Id.*, subd. (c)(4).) Thereafter if the legislative body proves that it cured or corrected its action, the court must dismiss the action with prejudice. (*Id.*, subd. (e).) Moreover, if the action substantially complied with the Brown Act, a court cannot pronounce it null and void. (*Id.*, subd. (d)(1).)

The County did not mention the Brown Act in any of its pleadings or papers: not in the petition/complaint, the ex parte application or the points and authorities in reply to the City's opposition. It did not seek a ruling on the purported Brown Act violation. ■ As a general matter a party must adhere on appeal to the theory on which the matter was tried. (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; *Mattco Forge, Inc.* v. *Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 [60 Cal.Rptr.2d 780].) Thus we will not entertain a new theory on appeal unless it presents purely a legal question, on an uncontroverted record requiring no factual determinations.

(*Mattco Forge, Inc.* v. *Arthur Young & Co., supra,* at p. 847.) And even then, to do so is within our discretion. (*Resolution Trust Corp.* v. *Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510].)

We will not consider the County's Brown Act theory. First, the County has not produced evidence of any demand to cure or correct. Second, the petition/complaint was filed outside the time frame for commencing an action under Government Code section 54960.1. Third, the issue of substantial compliance requires a factual determination. In short, the County has absolutely no basis for pursuing a Brown Act argument on this appeal.

### 2. *Noncompliance With CEQA*

The County also maintains that the City failed to comply with the California Environmental Quality Act (CEQA) when the city council enacted the service limitation policy. Without delving into the questionable merits of whether this policy amounted to a "project" subject to CEQA, we conclude the County did not initiate suit within the applicable statute of limitations.

A CEQA action "alleging that a public agency is carrying out or has approved a project which may have a significant effect on the environment" (Pub. Resources Code, § 21167, subd. (a)) without having made that determination "shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project . . . ." (*Ibid.*) The County's action, filed January 20, 1998, was untimely.

The County tries to circumvent this logic by styling the City's action an ordinance rather than a resolution. Unlike a resolution, which is effective immediately, an ordinance does not take effect until 30 days after its final passage. (Gov. Code, § 36937.)

Strictly speaking, there is a difference between a resolution and an ordinance. " 'An ordinance in its primary and usual sense means a local law. It prescribes a rule of conduct prospective in operation, applicable generally to persons and things subject to the jurisdiction of the city. "Resolution" denotes something less formal. It is the mere expression of the opinion of the legislative body concerning some administrative matter for the disposition of which it provides. Ordinarily it is of a temporary character, while an ordinance prescribes a permanent rule of conduct or of government.' " (*Central Manufacturing District, Inc.* v. *Board of Supervisors* (1960) 176 Cal.App.2d 850, 860 [1 Cal.Rptr. 733].) Nonetheless, in the absence of statutory or charter provisions to the contrary, a municipality can take legislative action by either resolution or ordinance. For many purposes

the terms are equivalent. (*Crowe* v. *Boyle* (1920) 184 Cal. 117, 149 [193 P. 111].)

Here the policy in question took the form of a resolution, passed by motion. Both City and County ordinances provide that the City will furnish water service to "any property within the corporate limits of the city and to such areas outside the city limits as the council may designate." The July 10 policy decision does not change these local laws. Rather, it represents an exercise of the discretion vested in the city council by ordinance to determine, from time to time, where the City will permit new water service. The policy is not permanent in nature because it does not preclude the city council from resolving again to redefine the City's water service obligations to outlying areas. Therefore, as stated in the motion, it became effective immediately upon adoption on July 10, 1997. The CEQA statute of limitations expired on January 6—14 days before the County filed its action.

The County argues alternatively that the limitation period did not begin until the City first acted to implement the policy, citing *Miller* v. *City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1142-1143 [17 Cal.Rptr.2d 408] (*Miller*) and *Endangered Habitats League Inc.* v. *State Water Resources Control Bd.* (1997) 63 Cal.App.4th 227, 240-243 [73 Cal.Rptr.2d 388] (*Endangered Habitats*). Public Resources Code section 21167, subdivision (a) states that the limitation period commences 180 days from the date of the agency's decision to carry out or approve the project or, if the project is undertaken without a formal decision, 180 days from the date of project commencement. Here the city council held a public hearing and, by formal motion, enacted the policy. Hence, July 10, 1997, is the date the limitation period commenced.

The County's cases are inapposite. The debate in *Miller* concerned whether the decision to approve the project was the earlier issuance of the "Approval in Concept" or the later issuance of the building permit. The building permit was the legally enforceable act because the "Approval in Concept" included numerous conditions which, if any one occurred, could doom issuance of the permit. *Endangered Habitats* involved approval and implementation of a drainage plan. The county first approved a general master drainage plan, which anticipated further environmental review. Such review did not occur. Thus the statute of limitations began to run with construction of the actual project.

Here the policy itself is a complete act which spells out exactly what will happen in the future with respect to provision of water to unincorporated areas. Implementation is the mere ministerial act of denying applications for new connections in unincorporated areas.

We reverse the judgment. County to pay costs on appeal.

Hanlon, P. J., and Poché, J., concurred.