[No. E037468. Fourth Dist., Div. Two. Jan. 23, 2006.]

SAN BERNARDINO ASSOCIATED GOVERNMENTS et al., Petitioners,
v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, Respondent;
SIERRA CLUB et al., Real Parties in Interest.

1108

## COUNSEL

Best, Best & Krieger, Michelle Ouellette, Steven C. DeBaun, Megan K. Starr; Bingham McCutchen, Stephen L. Kostka, Julie A. Jones; Ronald D. Reitz, County Counsel, Jean-Rene C. Basle and Mitchell L. Norton, Deputy County Counsel, for Petitioners.

Nossaman, Guthner, Knox & Elliott, Stanley S. Taylor and Stephen N. Roberts for Self Help Counties Coalition as Amicus Curiae on behalf of Petitioners.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Petitioners.

Bruce A. Behrens, Brelend C. Gowan, Maxine F. Ferguson, Martin W. Keck, and Denise Zuniga for Department of Transportation as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Barrington A. S. Daltrey for Real Parties in Interest.

## OPINION

**KING, J.**—Real parties in interest filed a petition/complaint for writ of mandate, injunctive relief, and declaratory relief (petition), in the superior court seeking to compel the San Bernardino County Board of Supervisors (Board) to conduct an environmental review before placing a sales tax measure on the November 4, 2004, ballot. Alternatively, if the sales tax measure was passed by the voters, to prevent the implementation of the measure. Petitioners filed a demurrer to the petition, which the trial court overruled. Petitioners now seek a writ of mandate ordering the trial court to reverse its decision and sustain the demurrer. For the reasons discussed *post,* we grant the petition.

### BACKGROUND

In 1987, the Legislature enacted the Local Transportation Authority and Improvement Act (Act) authorizing each county board of supervisors to create or designate a local transportation authority (authority). (Pub. Util. Code, § 180000 et seq., enacted by Stats. 1987, ch. 786, § 1, p. 2460.)[1] The Act empowers an authority to impose a sales tax in the county to fund local transportation needs and to issue bonds to be paid from the sales tax. The authority must fulfill three prerequisites before it may impose this sales tax. First, the authority's members must adopt a transportation expenditure plan for the revenues expected to be raised by the tax, together with federal, state and other local funds expected to be available for transportation improvements during the period for which the tax is to be imposed. (§§ 180201 & 180206.) Second, an ordinance imposing the tax must be approved by a two-thirds vote of the authority. (§ 180201.) Third, the ordinance must be approved by "a majority of the electors voting on the measure . . . at a special election called for that purpose by the board of supervisors, at the request of the authority . . . ." (*Ibid.*)

The Board designated the San Bernardino Associated Governments (SANBAG) to serve as the authority under the Act. SANBAG, a public

---

[1] All further statutory references are to the Public Utilities Code unless otherwise indicated.

agency listed in the Roster of Public Agencies (Gov. Code, § 53051), is a joint powers agency, created by agreement of its member agencies. Its member agencies are the County of San Bernardino (County), the Towns of Apple Valley and Yucca Valley, and the Cities of Adelanto, Barstow, Big Bear Lake, Chino, Chino Hills, Colton, Fontana, Grand Terrace, Hesperia, Highland, Loma Linda, Montclair, Needles, Ontario, Rancho Cucamonga, Redlands, Rialto, San Bernardino, Twentynine Palms, Upland, Victorville, and Yucaipa. SANBAG's board of directors includes the mayor or a city council person from each member agency, plus the five members of the Board and a nonvoting member appointed by the Governor. (§ 130054.)

In May 2004, SANBAG circulated the transportation expenditure plan to its member agencies for approval. By June 2, 2004, the required number of SANBAG members had approved the expenditure plan. At its board meeting on that date, SANBAG adopted Ordinance No. 04-01. This ordinance authorized a 30-year extension of the existing "Measure I" sales tax, adopted the transportation expenditure plan, and requested that the Board call an election for voter approval on the sales tax measure (Measure) to be held on November 4, 2004. On June 15, 2004, SANBAG posted a notice of exemption stating that its approval of the Measure is "[n]ot a project" under the California Environmental Quality Act (CEQA) and, if it is a project, it is exempt from CEQA.

At its June 29, 2004, meeting, the Board passed county resolution No. 2004-148, stating that the Measure shall be submitted to the voters and placed on the ballot for the November 2, 2004, election. The Board posted a notice of exemption on June 29, 2004, stating that its placement of the Measure on the ballot is exempt from CEQA under California Code of Regulations, title 14, section 15378, subdivision (b)(3) (CEQA Guidelines), and Public Resources Code section 21080, subdivision (b)(13).[2]

On August 3, 2004, real parties in interest Sierra Club and Allen Bartleman (collectively Sierra Club) filed their petition for writ of mandate in the trial court.[3]

---

[2] Section 15378, subdivision (b)(3), of the CEQA Guidelines provides that a "project," for purposes of CEQA, does not include "[t]he submittal of proposals to a vote of the people of the state or of a particular community that does not involve a public agency sponsored initiative. (Stein v. City of Santa Monica (1980) 110 Cal.App.3d 458; Friends of Sierra Madre v. City of Sierra Madre (2001) 25 Cal.4th 165)."

Public Resources Code section 21080, subdivision (b)(13), provides: "A project for the development of a regional transportation improvement program, the state transportation improvement program, or a congestion management program prepared pursuant to Section 65089 of the Government Code."

[3] The petition names as defendants and respondents the Board, the County, and SANBAG. According to the petition, SANBAG "apparently is the real-party-in-interest for purposes of Public Resources Code [section] 21167.6.5, as it is listed as the 'Applicant' on the Notice of

The petition alleged that SANBAG and the County were required by CEQA to prepare an environmental impact report (EIR) before placing the Measure on the ballot. The pleading further alleged that the placement of the Measure on the ballot was a discretionary project that will have an ultimate impact on the environment and constituted "the inception of a 'project' " under CEQA, requiring environmental review. The Sierra Club requested a writ of mandate, and injunctive and declaratory relief, voiding the placement of the Measure on the November 2, 2004, ballot; if the Measure remained on the ballot and was passed by the voters, the Sierra Club sought to prevent implementation of the Measure until CEQA has been complied with and the matter resubmitted to the voters.

SANBAG, the County, and the Board demurred to the writ petition. In their demurrer, they argued: (1) the Sierra Club filed its petition after the 35-day time limit to challenge the June 15, 2004, posting of SANBAG's notice of exemption relative to its approval (Pub. Resources Code, § 21167, subd. (d)); and (2) the Board, in placing the Measure on the ballot, performed a ministerial, rather than a discretionary, act, and thus the Board's action was not a "project" subject to CEQA (Pub. Resources Code, § 21080, subd. (b)(1); Cal. Code Regs., tit. 14, § 15268). The Sierra Club argued in its opposition to the demurrer that the action was not time-barred because a challenge to SANBAG's actions prior to the Board's placement of the Measure on the ballot would have been premature, and that its claims did not accrue until the Board placed the Measure on the ballot. The Sierra Club further argued that the Board's action constituted a discretionary project requiring compliance with CEQA.

The trial court agreed with the Sierra Club and overruled the demurrer. The court ruled that the limitations period had not run because the 35-day period within which to file a CEQA action did not begin to run until June 29, 2004, when the Board posted its notice of exemption. The trial court based this ruling on the theory that any challenge to SANBAG's actions would have been premature because there could be no possibility of an environmental impact until the Board decided to place the Measure on the ballot. The trial court further overruled the demurrer on the ground that the Board's decision to put the Measure before the voters was a discretionary act, not a ministerial act. The trial court found that sections 180201 and 180203 gave the Board discretion to decline to place the Measure on the ballot; it reasoned that section 180201 provides that the taxing agency (SANBAG) is to "request" that the Board place the sales tax measure on the ballot and that there is nothing in the

---

Exemption filed [by the Board] with respect to Measure 'I'." The referenced statute provides: "The petitioner or plaintiff shall name, as a real party in interest, any recipient of an approval that is the subject of an action or proceeding brought pursuant to [Public Resources Code] Section 21167, 21168, or 21168.5 . . . ." (Pub. Resources Code, § 21167.6.5, subd. (a).)

language that mandated that the Board do so. Therefore, the trial court reasoned, the Board had discretion to require SANBAG to comply with CEQA. The trial court also concluded that there were sufficient facts alleged in the petition to prove that the Measure qualified as a "project" under CEQA, requiring an EIR by the County.

Petitioners filed this petition for writ of mandate.

ANALYSIS

A. *Necessity of Writ Relief*

A writ of mandate may be issued "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law," such as "[w]here there is no direct appeal from a trial court's adverse ruling, and the aggrieved party would be compelled to go through a trial and appeal from a final judgment . . . ." (Code Civ. Proc., § 1086; *Fair Employment & Housing Com. v. Superior Court* (2004) 115 Cal.App.4th 629, 633 [9 Cal.Rptr.3d 409].) Discretionary writ review of an order overruling a demurrer is appropriate where the issue is a matter of public importance and requires immediate resolution. (*Smith v. Superior Court* (1992) 10 Cal.App.4th 1033, 1037 [13 Cal.Rptr.2d 133].) Here, the issue is a matter of public importance because the Measure's one-half of 1 percent sales tax extension is expected to raise approximately $6 billion between 2010 and 2040. The Measure states that revenues from the sales tax will be used to: widen and improve highways and freeways; improve freeway interchanges; improve local streets and roads; expand transit for seniors and disabled riders; and expand Metrolink commuter rail. These projects and services, as set forth in the expenditure plan, are of considerable and obvious benefit to the public. The "legislative findings and declarations" provision at the beginning of the Act includes the following relevant statements: "Local highway and transportation improvements and services are an immediate high priority needed to resolve local and regional transportation problems that threaten the economic viability and development potential of counties and cities and adversely impact the quality of life therein. Furthermore, regional transportation is a matter of statewide concern." (§ 180001, subd. (a).) "In order to deal in an expeditious manner with current and future local transportation maintenance and improvement needs, local agencies need to develop and implement local funding programs . . . ." (§ 180001, subd. (c).) Based on these factors, we find that writ review by this court is both permissible and appropriate.

B. *Standard of Review and Summary of Conclusion*

When reviewing by writ petition a ruling sustaining a demurrer, "[w]here a pure question of law is at issue . . . the appellate court reviews the issue de

novo." (*Fair Employment & Housing Com. v. Superior Court, supra*, 115 Cal.App.4th at p. 633.) The issues raised in this petition are questions of law, and therefore we review them de novo. (See *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974 [28 Cal.Rptr.2d 305].)

We hold that the demurrer should have been sustained because the Board's action in placing the Measure on the ballot is exempt from CEQA as a ministerial act and a submittal to the voters of a proposal not generated by the Board. (See *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165 [105 Cal.Rptr.2d 214, 19 P.3d 567] (*Sierra Madre*); *Stein v. City of Santa Monica* (1980) 110 Cal.App.3d 458 [168 Cal.Rptr. 39] (*Stein*); Cal. Code Regs., tit. 14, § 15378, subd. (b)(3).) We further hold that a challenge to SANBAG's earlier notice of exemption would not have been premature because it is SANBAG that exercises discretion in shaping the Measure, while the Board's action in placing the Measure on the ballot is solely ministerial. Thus, in order to challenge the Measure on the substantive ground that CEQA was not complied with, the Sierra Club should have filed its challenge to SANBAG's actions within 35 days of SANBAG posting its notice of exemption. Because it did not do so, to the extent that the petition could be construed as challenging SANBAG's notice of exemption, it is time-barred.[4]

## C. *The Board's Placement of the Measure on the Ballot Was a Ministerial Act*

CEQA requires a public agency to study the environmental impact of any "project" it proposes to carry out that "may have a significant effect on the environment." (Pub. Resources Code, § 21100, subd. (a).) However, "ministerial" projects are exempt from CEQA requirements. (Pub. Resources Code, § 21080, subd. (b)(1); Cal. Code Regs., tit. 14, § 15268.) A ministerial project is defined as "a governmental decision involving little or no personal judgment by the public official as to the wisdom or manner of carrying out the project." (Cal. Code Regs., tit. 14, § 15369.) Conversely, a project is discretionary, and thus by definition not ministerial, when it "requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity . . . ." (Cal. Code Regs., tit. 14, § 15357.) "The statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency can shape the project in a way that would respond to concerns raised in an [EIR], or its functional equivalent, environmental review would be a meaningless exercise." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

---

[4] Because we determine that the Board acted in a ministerial manner when it placed the Measure on the ballot, we need not decide whether SANBAG's approval of the Measure is a "project" under CEQA.

On appeal, the Sierra Club submits three arguments to support the trial court's conclusion that the Board acted in a discretionary manner in placing the Measure on the ballot for voter approval. First, the Board participated early on as a member of SANBAG in shaping the Measure. Second, placement of the Measure on the ballot was a discretionary decision under *Sierra Madre*. Third, the word "request" in section 180201, relative to SANBAG seeking to have the Measure placed on the ballot, implies that the Board has discretion to deny the placement of the Measure on the ballot. We reject each of these arguments.

1. *The Board's Early Participation as a Member of SANBAG Does Not Mean That the Board Exercised Discretion When It Later Placed the Measure on the Ballot*

The Sierra Club argues that the County's considerable participation earlier in the process as a member agency of SANBAG in approving and shaping the expenditure plan means that the Board exercised discretion when it later acted on SANBAG's request to place the Measure on the ballot. We disagree.

As described *ante*, the Act explicitly authorizes the County and its Board members, along with the incorporated cities and their city council members, to work together *in their capacities as SANBAG member agencies and Board members* to shape and approve the expenditure plan and to request that the Measure be placed on the ballot. (§§ 180201 & 180206.) However, nowhere does the Act suggest that the Board has an additional discretionary duty or authority to shape the expenditure plan or reject the request to place the Measure on the ballot *after* these have been duly approved by SANBAG. This would be contrary to the broad-based decisionmaking procedure that is built into the Act, which provides balance between and among the county and cities.

For example, when a county decides to create a new entity to serve as the authority, a majority of the cities having a majority of the population in the incorporated area of the county must consent to the membership of the authority. (§ 180051.) Further, the Act specifies that the members of the county board of supervisors may not be the majority of the authority's membership. (§ 180051.) The author of Senate Bill No. 142, by which this statutory scheme was enacted, specified in a statement to the Senate Transportation Committee that the legislation intends "to ensure that the broad spectrum of community interests are represented." (Senator Deddeh, Author's Statement on Senate Bill No. 142 (1987–1988 Reg. Sess.).)

The purposefully broad-based process for approving the expenditure plan and the two-thirds requirement for the authority to adopt the sales tax ordinance indicate the Legislature's intent to prevent the County from exercising its concentrated power over the dispersed and, presumably, less powerful individual cities. This purpose would be poorly served if we were to read into the Act a discretionary power or duty on the part of the Board to reject or change the sales tax ordinance and expenditure plan *after* it has been formulated, reviewed, and approved by the authority and its members via a process carefully crafted by the Legislature to ensure collective decisionmaking between the County and cities.

 Finally, the Legislature in section 180200 et seq. has given SANBAG and other local transportation authorities the power to impose a sales and use tax for transportation purposes, but only after obtaining the approval of the voters. However, as with many public entities that are given authority to tax for specific purposes upon voter approval, SANBAG does not itself have the power to place such a measure before the electorate. SANBAG must do so through the Board. If the Board is allowed to exercise discretion by either (1) voting to deny SANBAG access to the ballot, or (2) modifying the sales tax ordinance or expenditure plan, then the Board would be able to effectively deprive SANBAG of the specific taxing power and the responsibility for regional transportation planning given to it directly by the Legislature. We do not see anything in the language of the Act itself or in the legislative history that indicates the Legislature contemplated giving counties such power when it enacted the Act.

2. *Because the Board Did Not Generate the Measure, Placement of the Measure on the Ballot Was Not a Discretionary Act*

The Sierra Club argues that *Sierra Madre* requires that any public agency that places a measure on the ballot must comply with CEQA before doing so. In *Sierra Madre*, our Supreme Court held that the City Council of Sierra Madre could not avoid CEQA review of its decision to remove certain structures from historic preservation status simply by submitting an ordinance to the voters proposing such an action. The city sought to benefit from the CEQA Guidelines, which at that time provided that a CEQA "project" did not include "[t]he submittal of proposals to a vote of the people of the state or of a particular community." The court in *Sierra Madre, supra*, 25 Cal.4th 165 found that the city's action did not fall within this guideline because "the decision to place the measure on the ballot [was] discretionary . . . . Therefore, placing the council-generated initiative measure on the ballot was not the type of ministerial act contemplated by the guideline." (*Id.* at p. 187.)

■ A close reading of *Sierra Madre* does not support Sierra Club's position. The precise holding of the Supreme Court in *Sierra Madre* is as follows: "CEQA compliance is required when a project is *proposed and placed* on the ballot by a public agency." (*Sierra Madre, supra,* 25 Cal.4th at p. 171, italics added.) The city council in that case acted in a discretionary manner because it proposed and generated the ballot measure itself. If it had merely placed the measure on the ballot at the direction of the voters acting through the initiative power, the city council's placement of the measure on the ballot would have been ministerial. (See *id.* at p. 189.) In other words, the city council's placement of the project on the ballot was not exempt because the city made the discretionary decisions concerning the measure, including the decision to ask the voters to approve the measure.

In the same way, SANBAG, not the County, made the discretionary decisions concerning the Measure. The County, acting through its Board, merely placed the Measure on the ballot at the request of SANBAG; it did not propose or generate the Measure. SANBAG proposed and generated the Measure, and so the burden of CEQA compliance (if it falls to any entity) falls to SANBAG, not the County. While the County did participate in proposing and generating the Measure earlier on, it did so solely in its role as a member of SANBAG.

In our view, the situation at hand is more analogous to the facts in *Stein*. In that case, the appeals court held that the placement of an initiative measure on the ballot in response to a citizen petition is not a CEQA "project." The court reasoned that the city performed a ministerial function rather than a discretionary one because the election "was an activity undertaken by the electorate and did not require the approval of the governing body." (*Stein, supra,* 110 Cal.App.3d at pp. 460–461.) This is in part because former section 34461 of the Government Code provided that the city " 'shall submit the amendment . . . to the electors' " if it determined that the initiative petition was signed by the required percentage of voters. (*Stein, supra,* at p. 460.) The court found that the city merely acted as the agent for the initiative's sponsors when it placed the measure on the ballot.

In *Stein*, it was the citizens group, acting through the petition power, which made the underlying decision to ask the voters to approve that measure. In the same way, the Measure was an activity undertaken by SANBAG, not by the County. The County, despite its earlier participation as one of many SANBAG members, was merely the agent of SANBAG when it later placed the Measure on the ballot, as provided by section 180201.

3. *Use of the Word "Request" in Section 180201 Does Not Make the Board's Placement of the Measure on the Ballot a Discretionary Act*

The prerequisites to imposing SANBAG's sales tax ordinance under the act are described in section 180201: "A retail transactions and use tax ordinance . . . may be imposed . . . if the tax ordinance is adopted by a two-thirds vote of the authority and imposition of the tax is subsequently approved by a majority of the electors voting on the measure, or by any otherwise applicable voter approval requirement, at a special election called for that purpose by the board of supervisors, *at the request of the authority,* and a county transportation expenditure plan is adopted pursuant to Section 180206." (Italics added.) The Sierra Club argues, and the trial court agreed, that the word "request" implies that the Board had discretion to decline to place the measure on the ballot. We disagree.

■ "[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . . The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

In enacting the Act, the Legislature found that "[l]ocal highway and transportation improvements and services are an immediate high priority needed to resolve local and regional transportation problems that threaten the economic viability and development potential of counties and cities and adversely impact the quality of life therein." (§ 180001, subd. (a).) The state's transportation needs, the Legislature declared, needed to be addressed "in an expeditious manner" by developing and implementing local funding programs made available by the Act. (§ 180001, subd. (c).) Furthermore, "[i]t is in the public interest to allow the voters of each county to establish local transportation authorities and raise additional local revenues to provide highway capital improvements and maintenance and to meet local transportation needs in a timely manner." (§ 180001, subd. (d).)

In light of these expressions of legislative intent, we now look to the words of the statute. The phrase "at the request of the authority," appears in the clause describing one of three prerequisites to imposing the tax: before the tax can be imposed, it must be approved "at a special election called for that purpose by the board of supervisors, *at the request of the authority.*" (§ 180201, italics added.) Although the word "request," by itself, often implies that the person to whom the request is made has the power or discretion to grant or deny the request, here the word is part of the phrase, "at the request of the authority." This phrase modifies "special election," and indicates the source of, or a causal relation with, the special election; that is, the required special election is not one that takes place whenever the Board decides to call the election, but is one that is called "at the request of the authority."[5] The phrase is thus interchangeable with "upon the request of the authority," or "when requested by the authority." So construed, the "request of the authority" is merely the event that triggers the calling of the special election; as such, it implies no discretion or decisionmaking power in anyone.

The reference to the board of supervisors in the same clause does not alter this interpretation. The phrase, "called for that purpose by the board of supervisors," is merely another modifier of the "special election" phrase. Thus, the special election is not only one that occurs "at the request of the authority," but is also one that is called for a certain purpose (to approve of the tax measure ordinance) and by a certain entity (the board of supervisors). The language, "by the board of supervisors," merely identifies who it is that "calls" the special election after the authority makes its request.

■ Thus, by giving the words of the statute their usual, ordinary meanings, and giving effect to every word and phrase, the statute can be read as requiring the special election to be called upon the request of the authority, without any implication that the board of supervisors has any discretion or power to deny the authority's request. Moreover, if the Legislature had intended to give the board of supervisors the discretion to reject a request to call a special election, it could easily have made that intent clear. In addition to making such discretion express (such as by stating, for example, "the board of supervisors shall determine in its discretion whether to call a special election"), the Legislature could have implied such discretion by providing that the tax be imposed only on the condition that it first be approved by the board of supervisors. Indeed, the Sierra Club argues that the statute's use of

---

[5] The key word in the phrase for our purposes is thus not "request," but "at." Although there are many definitions of "at," the most fitting definition here is as a preposition "used to indicate a cause or source." (Webster's Encyclopedic Unabridged Dict. of the English Language (1996) p. 129.)

the word "if" indicates such a condition. As we construe the statute, however, the conditions introduced by the word "if" do not include the Board's approval of the Measure, but rather: (1) the adoption of the ordinance by two-thirds of the members of the authority; (2) the approval by voters at a special election (which is called by the board of supervisors upon the request of the authority); and (3) the adoption of a county transportation expenditure plan. The call of the election by the board of supervisors is thus not a condition to the imposition of the tax, but rather a ministerial event that occurs "at the request of the authority."

This construction of the statute is consistent with the stated legislative findings and declarations, which emphasize the need to deal with local transportation issues in an "expeditious manner" and to give voters the ability to raise revenue to meet their transportation needs in a timely manner. If the county board of supervisors were given discretion to refuse the placement of the authority's ordinance on the ballot, they would delay or deprive the voters of this ability. Such discretionary power would also permit county boards of supervisors to make demands upon, or control the nature of, the authority's work. By contrast, our construction of the statute—which limits the County's role once the expenditure plan and the Measure have been approved by the authority's members—is consistent with the expeditious exercise of the public's ability to hold elections and raise the revenue contemplated by the Act.

Nor have we found anything in the legislative history of the Act that hints that the Legislature intended to give counties the power to change the transportation expenditure plan or sales tax ordinance, or to decline to place the ordinance on the ballot, after both had been approved by the local transportation authority using the process set forth in the Act. The Act was enacted to "provide equivalent authorization for all counties [to impose a sales tax for transportation purposes] . . . thereby eliminating the need for counties to seek authorization [from the Legislature] on an individual basis and establishing a uniform statewide policy for transactions and use taxes." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 142 (1987–1988 Reg. Sess.) as amended June 22, 1987.) This generic procedure became desirable because a number of counties had over the years individually obtained legislative approval to seek voter approval of local sales tax measures to fund transportation projects. (See, e.g., §§ 132301, 132303 [San Diego]; §§ 130350, 130351 [Los Angeles]; §§ 130401, 130403 [Orange]; former §§ 140251–140253 [Santa Clara]; §§ 142250, 142252 [Fresno]; §§ 150201, 150203 [Tuolumne].) In fact, several bills were introduced during the same legislative session as Senate Bill No. 142 seeking similar authorization for individual counties. (Sen. Rules Com., Off. of Sen.

Floor Analyses, 3d reading analysis of Sen. Bill No. 142 (1987–1988 Reg. Sess.) as amended Mar. 10, 1987.) Our examination of these earlier statutes reveals no tradition, upon which the drafters of Senate Bill No. 142 might have drawn, of giving county boards of supervisors discretion to shape the sales tax measure or refuse to place it on the ballot after it was adopted by the authority. Thus, we find no reason to read into the standardized procedure provided by Senate Bill No. 142 a discretionary power on the part of the county board of supervisors to refuse to place the sales tax measure on the ballot as adopted by the transportation authority.

Our conclusion is further supported by consideration of the statutory scheme of which section 180201 is a part. (See, e.g., *Communications Relay Corp. v. County of Los Angeles* (2005) 130 Cal.App.4th 162, 166 [30 Cal.Rptr.3d 1].) Section 180201 provides that the tax measure is to be voted on "at a special election called for that purpose by the board of supervisors, at the request of the authority." Section 180203, subdivision (a), states, "The county shall conduct the special election called by the board of supervisors pursuant to Section 180201. . . ." Section 180203, subdivision (a), does not state that the county shall conduct the special election *if* called by the board; the county shall conduct the special election called by the board. In viewing these two sections together, there is nothing that implies or suggests that the board of supervisors has discretion to decide whether it will place the sales tax measure on the ballot.

D. *The Statute of Limitations to Challenge SANBAG's Discretionary Approval of the Measure Had Already Run*

Both parties agree that the Sierra Club did not file its challenge within 35 days of SANBAG's posting of its notice of exemption. The trial court held, however, that the 35-day statute of limitations for the Sierra Club to file its CEQA action challenging the Measure and expenditure plan began to run on June 29, 2004, when the Board posted its notice of exemption. The court noted that "but for submitting [the Measure] to the vote of the electorate, the CEQA issue is not triggered." "The electorate could not vote on the measure until [the Board] ordered its placement on the ballot on June 29th. . . . [¶] [I]f [the Board] ha[d] taken no action, assume after the request was made and no measure was placed on the ballot, there would have been no possibility of physical changes in the environment which could result in environmental impact." In other words, the 35-day limitations period for a substantive CEQA challenge to the Measure was not triggered by SANBAG's action, but rather by the Board's placement of the Measure on the ballot. We disagree.

If the expenditure plan or the Measure required compliance with CEQA (a question we do not decide), it was SANBAG, as the body substantively responsible for the Measure, that would have been required to conduct an environmental review. "CEQA's purpose is to inform the public and its governmental officials of the environmental consequences of their decisions before they are made." (*Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 84 [99 Cal.Rptr.2d 378], citing *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].) The governmental officials who shape the contents of the expenditure plan, and who must be knowledgeable about the environmental consequences of their decisions, are the members of SANBAG. The discretion to determine the specifics of the "project," that is, to approve the expenditure plan and Measure, clearly lies with SANBAG, not the Board. In that it is SANBAG that fashions the Measure, it is from SANBAG's posting of the notice of exemption that the 35-day limitations period runs.

Under the Sierra Club's approach, the Sierra Club would file its petition for writ of mandate, as it did here, within 35 days of the Board's posting of its notice of exemption. Following the filing of the action, the trial court could find that certain environmental impacts of the project were not considered. In such a scenario, the court could grant the petition and return the matter to the Board for consideration of the identified impacts. In that the Board acted solely in a ministerial fashion and did not shape the Measure in the first place, it would be unable to consider additional impacts and make substantive changes to the Measure. Additionally, in that the Board and SANBAG are separate entities, the Board would be unable to compel SANBAG to consider the environmental impacts identified by the trial court.

The alternative scenario, where the limitations period for filing a CEQA challenge runs from SANBAG's posting of the notice of exemption, better serves the purposes of CEQA. It is SANBAG, not the Board, that formulates and considers whether to approve the "project." Upon challenge, if the court were to find that SANBAG's actions are not exempt from CEQA and conclude that other environmental impacts needed to be considered, the court could order SANBAG (the entity in charge of shaping and considering the "project") to consider the impacts identified by the trial court. (See Pub. Resources Code, § 21168.9; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 422–425 [253 Cal.Rptr. 426].) Thus, the intent of CEQA can be more fully realized only if the limitations period begins to run from SANBAG's approval.

This outcome is consistent with the smattering of case law on the commencement of the various statutes of limitations imposed by Public Resources Code section 21167. For example, in *County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965 [84 Cal.Rptr.2d 179], a city enacted a policy that it will cease providing new utility connections outside its incorporated territory. The court held that the operative act is the city's decision to enact the policy. The court rejected the contention that the operative act takes place only when the city first implements the policy by denying an application for a new connection. This is because, as with the Board's decision to place the Measure on the ballot here, the implementation is a "mere ministerial act." (*Id.* at p. 980.) "[T]he policy itself is a complete act which spells out exactly what will happen in the future . . . ." (*Ibid.*) The same is true about SANBAG's approval of the expenditure plan and Measure.

This "decision vs. implementation" dichotomy, where implementation is a ministerial act, is also found in *Simi Valley Recreation & Park Dist. v. Local Agency Formation Com.* (1975) 51 Cal.App.3d 648 [124 Cal.Rptr. 635]. In that case, the court concluded that the operative act for Public Resources Code section 21167 statute of limitations purposes, occurs when a local agency formation commission decides to approve the detachment of land from the territory of a park district, not when the county board of supervisors subsequently begins detachment proceedings. As with the Board's placement of the Measure on the ballot in this matter, the applicable statutes make the board of supervisors' implementation of detachment proceedings a "purely ministerial" act. (*Simi Valley Recreation & Park Dist. v. Local Agency Formation Com., supra,* at pp. 666–667.)

 Here, the statute of limitations ran from the notice of exemption filed by SANBAG rather than from the Board's later ministerial act of placing the Measure on the ballot. This conclusion is consistent with both the purpose and process of CEQA.

## CONCLUSION

In sum, we conclude that the trial court should have sustained the demurrer. SANBAG, not the Board, was the entity that had the discretionary power to shape the Measure and expenditure plan to respond to environmental concerns. The Sierra Club did not timely bring its lawsuit to challenge SANBAG's determination that the Measure was exempt from CEQA. The Board was not a proper substitute for SANBAG because the Board could neither reshape the Measure and expenditure plan to comply with CEQA, nor could it refuse to place the Measure on the ballot.

## DISPOSITION

The petition for writ of mandate is granted. Respondent court is ordered to vacate its order overruling petitioners' demurrer and enter a new order sustaining the demurrer without leave to amend.

McKinster, Acting P. J., and Gaut, J., concurred.